[Civ. No. 4214.   Fourth Dist.   Oct. 9, 1950.]

Estate of LESLIE B. SMILIE, Deceased. MAX RAMELOW, Petitioner and Respondent, v. JOE T. SMILIE et al., Proponents and Respondents; JEWEL SMILIE, Appellant.

Hillyer & Hillyer, William Hillyer and Raymond F. Coady for Appellant.

Donald A. Stewart and Harrison G. Sloane for Respondents.

GRIFFIN, J.—In 1940, Jewel Smilie, formerly Jewel Sparks, became the wife of the deceased, Leslie B. Smilie. Mr. Smilie had been previously married and of that issue there were three children, namely, Joe T. Smilie, William V. Smilie and Margaret Smith (Raycraft). At the time of his death Mr. Smilie was paying alimony to this previous wife. His second

wife became ill and was being nursed by Mrs. Jewel Sparks, who had also been divorced from her husband. Within one month after the death of the second Mrs. Smilie, Leslie B. Smilie married Jewel Sparks, who had a daughter by her previous marriage named Dot or Dorothy. Dorothy married one Phillip Heaser. About three months after Jewel Sparks married Leslie B. Smilie they went to an attorney and had prepared a last will and testament in which Mr. Smilie nominated his wife executrix of his will, bequeathed to her all of his property of every description, and therein stated that he intentionally made no gift to his three named children. Therein he also authorized his wife, upon his decease, to conduct and operate any business that he might have been operating. Considerable property in the form of ranches, duplexes, and vacant property were acquired during their marriage and title was taken in the name of Mrs. Smilie. Mrs. Smilie continued conducting his electrical business and, as evidenced by cancelled checks, considerable sums of money were paid over to Mrs. Smilie by him. Apparently Mrs. Smilie attended to the rentals and the reinvestment of the funds derived from such rentals, as well as the management of the property in general. Mrs. Smilie's daughter and son-in-law operated one of the ranches with Mrs. Smilie, on a share-cropping basis. Some time prior to July 2, 1949, some marital difficulties arose between the Smilies and particularly in relation to the Heasers. Mr. Smilie complained about this over a period of time to his friend Max Ramelow, a half-brother of Jewel Smilie, who resided in El Cajon, California. About July 2, 1949, Mr. Smilie went to the ranch being operated by the Heasers and some dispute arose between them in reference to the operation of the berry-picking activities being conducted thereon. Apparently Phillip Heaser struck Mr. Smilie with his fist and inflicted some injury upon him. The evidence is conflicting as to how the dispute arose and Heaser and others present testified that Mr. Smilie was in the act of grabbing some instrument just previous to that time in an effort to strike Heaser. After his return home to San Diego that evening Mr. Smilie wrote a letter, all in his own handwriting, as follows:

"July 2-49.

"Dear Max—

"Well Jewel & Dot had me beat up today. I did not ~~think~~ Phip would do that.

"Jewel & Dot have been raising hell for two weeks. So

today they had Phip beat me up. I did not think Phip would do thing like that. This was done at the farm today about 2:30 P. M.

"I have asked Jewel a number of times to let us devind up. but she will not do any.

"I want you to see that all my bills are paid and that Dot does not get thing. I want you to have all of my after my bill are.

"I am told Dot is going to move back to Knemore so she can look after thing.

"Love to all

"L. B. Smilie.

"This is all over money Dot wants it all."

This letter was mailed to Mr. Ramelow, and soon thereafter, Mr. Smilie committed suicide. Ramelow presented this letter with a petition to probate it as Mr. Smilie's last will and testament and asked that he be appointed executor thereunder. A few days later, Mrs. Smilie presented the last will and testament of Mr. Smilie dated May 22, 1940, and petitioned for the probate of that will. After a hearing was had the trial court admitted the letter dated July 2, 1949, as the last will and testament of the deceased, appointed Ramelow executor and denied probate of the former will. From this order Jewel Smilie has appealed. At the trial she questioned the mental competency of the deceased to make the will admitted to probate. The court found that he was mentally competent for this purpose. The evidence on the subject was conflicting and in view of the time-honored rule this court is not at liberty to disturb that finding. (*Chichester* v. *Seymour,* 28 Cal.App.2d 696 [83 P.2d 301]; *Estate of Wall,* 183 Cal. 431 [191 P. 687]; *Estate of Snowball,* 157 Cal. 301 [107 P. 598].)

The only remaining questions raised by contestant on this appeal are (1) Whether the letter of July 2, 1949, was, as found by the court, intended by deceased to be a will, i.e., was testamentary intent reasonably reflected by the document and by the surrounding circumstances; (2) if so intended, whether it sufficiently refers to any corpus so as to be a devise of *any* property; and (3) whether it entirely revoked the former will of 1940.

As to these questions contestant argues that since deceased went to an attorney's office to make the first will, it is clear that he knew the nature and requirements of a valid will;

that decedent made no statement in the document that he wished it to operate as a will or that he was about to die; that he made no mention of his property therein; that he did not discuss therein the disinheritance of his wife or what provision he wished to make for his children by his previous marriage; that the letter, thus written, from the language used, did not clearly show that it was the purpose of the deceased to thereby make a disposition of his property contrary to the previously executed former will, and that the testamentary character of the instrument was not shown "with legal certainty," citing such cases as *Estate of Wunderle,* 30 Cal.2d 274, 280 [181 P.2d 874]; *Estate of Golder,* 31 Cal.2d 848, 850 [193 P.2d 465]; *Estate of Spitzer,* 196 Cal. 301 [237 P. 739]; *Estate of Branick,* 172 Cal. 482 [157 P. 238]; *Estate of Major,* 89 Cal.App. 238, 241 [264 P. 542]; *Estate of Meade,* 118 Cal. 428 [50 P. 541, 62 Am.St.Rep. 244]; *Estate of Kelleher,* 202 Cal. 124 [259 P. 437, 54 A.L.R. 913]; *Estate of Lynch,* 142 Cal. 373 [75 P. 1086]; and *White* v. *Deering,* 38 Cal.App. 433, 437 [177 P. 516].)

In appropriate findings the trial court held that the letter was testamentary in character; that by it deceased intended to revoke the former will and intended to devise nothing to his wife or her daughter and did intend thereby to devise his entire estate to Max Ramelow after payment of his bills. The findings then set forth the interpretation given the instrument by the trial court as follows:

"I have asked Jewel a number of times to let us divide up but she will not do anything.

"I want you to see that all of my bills are paid and that Dot does not get a thing. I want you to have all. . . .

"This is all over money. Dot wants it all."

The main complaint in reference to this construction is that the court has erroneously stricken from the sentence the words italicized as follows: "I want you to have all *of my after my bill are.*" Apparently the trial court arrived at this construction on the theory that the words that were stricken were mere surplusage. The argument is that the court has, by striking these words, so modified the will as to substitute its own interpretation in the place and stead of the vague meaning therein reflected; that since the deceased did not make it clear whether he wanted Max Ramelow to have all of his personal belongings or all of his money or all of his

business property, the court was not authorized to modify this expression to make it include *all* of his property.

The evidence surrounding the making of the will shows that shortly after the marriage of Leslie B. Smilie and contestant, she had the deceased make a will in which she was the sole beneficiary to the exclusion of his natural heirs. She endeavored to account for the subsequent acquisition of the properties, title to which was vested in her, by attempting to show that she furnished the money for the purchase thereof, and accordingly, the entire property was her separate property. On cross-examination she had considerable difficulty in remembering where she had obtained her divorce from her previous husband, and what property she secured by virtue of a property settlement agreement with him. (This agreement, subsequently produced, recites that Mr. Sparks agreed to pay her $960, @ $50 per month.) She endeavored to show that she kept approximately $16,000 in a safe deposit box in her own home and that she spent this money in buying the property which now stands in her name. Checks were received in evidence showing that the deceased had given to her considerable sums of money during their married life. The parties made individual income tax returns during those years. Mr. Smilie's return listed all income from rentals on property standing in his wife's name, as well as all income from his business. He claimed one-half of that income as community property. Mrs. Smilie's return listed one-half of the same income as community property without further itemization. The testimony likewise shows that the deceased was endeavoring to have the contestant divide the property between them, apparently in contemplation of some marital separation and that the contestant failed to accede to his request. The evidence further discloses that the beneficiary under the last purported will was a friend and confidant of the deceased and that the deceased disclosed his matrimonial differences to him; that he took a great dislike to the daughter of the contestant and that it was his determination that she receive no part of the estate owned by him and his wife. The deceased apparently recognized that the contestant had a community interest in and to a certain portion of the property owned by them and that in case of his death he had no authority to dispose of her portion of the community property. The previous will indicates that the deceased did not intend to remember his own children in his will. It therefore would not be an unreasonable construction of the document under considera-

tion to hold that the deceased intended that the contestant receive no part of *his* estate, for the reasons expressed, and that his friend, Max Ramelow receive the portion which she was entitled to receive under the former will. This interpretation, therefore, would in effect completely modify and change the terms of the former will and in effect revoke it. (*Estate of Martin,* 31 Cal.App.2d 501 [88 P.2d 234] ; *Estate of Mallon,* 28 Cal.App.2d 106 [81 P.2d 992] ; Prob. Code, § 72; 51 A.L.R. 652; *Estate of Fuller,* 135 Cal.App. 781 [28 P.2d 399] ; *Estate of Siemers,* 202 Cal. 424 [261 P. 298] ; *Estate of Dargie,* 216 Cal. 667 [15 P.2d 849].)

Just what property is or may be shown to be community property and subject to distribution under the will is not a question before us at this time. Whether Max Ramelow will be able to receive any portion of the proceeds of the decedent's estate, in view of the fact that the pretermitted heirs may claim it under the law of succession, is likewise not before us for review. These heirs are appearing as proponents of the will that was admitted to probate and are respondents in the present proceedings.

*Estate of Soulie,* 72 Cal.App.2d 332 [164 P.2d 565], was relied upon heavily in support of the trial court's ruling that the words ''of my'' could be stricken out of the sentence in the will. Although there is a slight factual difference, the general principle applicable to the construction of a will is there stated, i.e., that the court cannot ordinarily supply omissions nor insert words in a will, but words of surplusage may be stricken; that the instrument should always be read ''from its four corners'' and all parts of the will construed in relation to each other to form one consistent whole, and that the cardinal principle applicable to the construction of a will is to ascertain the intention of the testator as expressed therein, citing cases. There is no definite, fixed rule by which testamentary intention may be gauged, but each case must stand upon its own peculiar facts. A will is a disposition of property to take effect at the death of the testator and in determining whether the instrument propounded was intended to be testamentary, reference will be had to the surrounding circumstances, and the language will be construed in the light of these circumstances. If it shall then appear that the instrument was intended to be testamentary, the court will give effect to the intention, if it can be done consistently with the language of the instrument and the particular form of the

instrument is immaterial. No particular words are necessary to show a testamentary intent. It must appear only that the maker intended by it to dispose of property after his death. (*Estate of Spitzer*, 196 Cal. 301 [237 P. 739].) Many of the cases cited by contestant were decisions upholding findings of the trial court denying admission to probate of a proffered document.

In *Estate of Blalock*, 95 Cal.App.2d 463 [213 P.2d 100], the will in controversy, written upon two sheets of lined paper, apparently torn from a small memorandum book, was before the court for construction, and after reciting many of the rules and cases above cited, the court stated that when it clearly appears on the face of a testamentary document that the maker's meaning is not completely expressed by the words used, and it is also clear what words are omitted, those words may be supplied in order to carry out the intention as manifested by the context. And that in order to learn the intention of the testator the whole will may be scrutinized and words may be interpolated or transposed.

In answer to the argument that it was apparent from the instrument admitted to probate that the decedent did not have his own children in mind, the trial court stated: "We don't know whether he knew that by failing to mention his children he would leave his property in such a condition that they would take under the law of succession. He might have known it. Who knows that he didn't know it, so we leave his will as we found it and simply clarify it in those respects in that it might not clearly express what we believe his intention to have been."

The trial court's construction of the will is not unreasonable and is in accord with the recognized rules of construction and apparently carries out the obvious intent of the testator to dispose of his entire estate.

Order appealed from is affirmed.

Barnard, P. J., concurred.

A petition for a rehearing was denied November 2, 1950, and appellant's petition for a hearing by the Supreme Court was denied December 7, 1950. Edmonds, J., voted for a hearing.