66 Cal.Rptr.3d 34 (2007)
155 Cal.App.4th 197
Estate of Homer Eugene WILLIAMS, Deceased.
Deborah Ann Cox, as Executor, etc., Petitioner and Respondent,
v.
Eric Williams Towle, Objector and Appellant.
No. H030830.
Court of Appeal of California, Sixth District.
August 24, 2007.
*37 Kai Henrich Wessels, San Jose, CA, for Petitioner and Respondent.
Michael Jay Jones, Gallagher, Reedy & Jones, Los Gatos, CA, for Objector and Appellant.
BAMATTRE-MANOUKIAN, Acting P.J.
In this probate case, Eric Williams Towle, the biological son of the decedent, Homer Eugene Williams, appeals from orders admitting to probate a holographic will offered by the decedent's stepdaughter, Deborah Ann Cox, and appointing Cox *38 executor. Appellant's principal argument is that the document is not a valid holographic will under Probate Code section 6111[1] because it is not signed by the decedent. Appellant also argues that the document is not a valid will because it does not completely dispose of the decedent's assets and because it lacks language demonstrating testamentary intent. Our review of the law regarding holographic wills and the evidence in this case supports the trial court's finding that the document admitted to probate is a valid holographic will. We therefore affirm the orders.

BACKGROUND

Procedural History
Homer Eugene Williams died on December 7, 2005. On February 21, 2006, his son, Eric Williams Towle (Towle), filed a petition to administer his father's estate, alleging that his father had died intestate. The petition was granted on March 22, 2006.
On May 10, 2006, the decedent's stepdaughter, Deborah Ann Cox (Cox), filed a petition for suspension of Towle's powers as personal representative of the estate. Concurrently, she filed a petition to admit a holographic will[2] into probate, and a petition to be named the executor of the estate, as specified in the will. Towle objected to Cox's petition for probate of the holographic will and to her appointment as the executor of the estate.
On May 23, 2006, following a hearing on May 19, 2006, the court ordered Towle's powers as personal representative suspended, pending a decision on the purported holographic will.
A hearing was held over four days between June 12, 2006 and August 30, 2006, after which the court took the matter under submission. On the following day, August 31, 2006, by minute order, the court granted Cox's petitions and issued orders entering the holographic will into probate and naming Cox as executor of the decedent's will.
Towle filed a notice of appeal on October 17, 2006. He appeals the order admitting the holographic will to probate and the order appointing Cox as executor.[3]

Evidence
Cox, Towle, and Virginia Towle, the decedent's first wife, testified at the hearing. Testimony centered around the circumstances in which the will was found, the decedent's customary way of signing and completing documents, the relationship the decedent had with his children and stepchildren, and his expressions of his testamentary wishes.
After the decedent's death, Towle was unable to locate a will in the decedent's belongings and thus began probate proceedings based on the understanding that no will existed. About a week after the decedent's death, Cox found what appeared to be a holographic will in "the center drawer of [decedent's] desk" and later brought this to the attention of Towle's attorney. The desk contained other important documents such as bank statements and tax returns. The center drawer did not appear to contain any important *39 documents other than a checkbook.
The document found by Cox was handwritten on the front and back of the first page of a note pad. The entire text was written in block-style capital letters. The next two sheets of the note pad were blank. After the blank pages, the next page of the note pad contained what appeared to be a list of movies, in the same block printing. The remaining pages were blank.
The words "Last Will, Etc. or What? Of Homer Eugene Williams" appear at the top of the document, followed by the decedent's address. The document then names Deborah Cox and Lorna Williams as executors, states their relationships to the decedent (stepdaughter and sister-in-law respectively), and includes their addresses. It then states "Power of Attorney: Now Deborah Cox." This is followed by a disposition of the decedent's collectibles. The document says, "All My Collictables: Everything including two pistols and two rifles, none fired: to Nephew Kirk Bell." Kirk Bell's address is included. Next is a paragraph stating, "In the event of a serious sickness or accident: I do not want to be kept alive by life support means. I name my executors to see to my wishes are carried out." Then there is a heading entitled "My Estate." This is followed by two items"House" and "Bank Account." The present market value of the house is stated to be "$225,000 to $350,000." The bank accounts include "Checking and Savings," but no balances are stated. The final paragraph states, "I would like my step daughter, Debra Cox to be able to live in the house as long as she wants before putting it up for sale."
Cox testified that the name written at the top of this document appeared to be written by the decedent. She explained that the decedent often left her notes to do things for him that were in block letters, with his name also written in block letters, similar to that on the holographic will. Cox had never seen the decedent write in cursive, although she had come across checks where he had signed his name. Cox explained that her stepfather was aware of the value of properties in the neighborhood because he would talk to people on the block when properties were for sale. Therefore, she believed that his estimate of the value of the house at $225,000 to $350,000 likely reflected values at the time he wrote the document. Cox estimated that the current value of the house is approximately $700,000, which she believed indicated that the document was written some years ago. Where she found the notepad, in the decedent's desk drawer, he would have had easy access to it.
Cox testified that the decedent had told her that "he put [her and his sister-in law] both down as the executor for his will." He was aware that Cox had previously been the executor for her grandmother's estate and he knew that the probate had gone smoothly. Cox testified that she is "the general cashier in charge of the cash" at the Marriott Hotel in Santa Clara. In this position, she handles forty-nine thousand dollars in cash each day. Prior to being the general cashier, Cox was "the accounts payable" person and was in charge of "paying bills." Cox also testified that "on two occasions" her stepfather had promised her the house. He had told her "if I stayed there with him, I would get the house if he died, and then also when the house was paid off and he showed me the paper from the bank and says now, you don't have anything to worry about." The decedent had two life insurance policies. One was payable to Cox, and her niece was the beneficiary of the other one.
The decedent and Virginia Towle divorced when their two children, Eric and *40 Gayle, were three and seven respectively. Virginia Towle remarried four years later and subsequently began using Towle as her last name and the last name for her children. The decedent also remarried and began living with his second wife and her children, including Cox. In the 1970's, they moved as a family to 1945 Serge Avenue, San Jose, where the decedent lived until his death in 2005. Cox left home while in college, but moved back into the home at 1945 Serge Avenue for good in 1988, at her stepfather's request after her mother had died. She provided companionship and care for her stepfather for the last 17 years of his life. She did things such as fixing his dinner, cleaning, shopping, doing laundry, running errands, picking up medications, and taking him to the doctor. When he became ill, she continued to take care of him. The night before he died, she went to the hospital with him and stayed with him until he died. The Towle family decided not to have a funeral because the family had plans for Virginia Towle's birthday. Cox later learned that the cremation had taken place and that the ashes had been sent back to Nebraska. She and her niece were very upset by this.
Cox testified that she and her stepfather had a close, loving, familial relationship. She called him "dad." He had mentioned to her that he wanted to adopt her. In contrast, she testified that the decedent had a "distant" relationship with his biological children. She said that Eric Towle only visited his father "five times" in thirty years, although' he lived in Scotts Valley and worked in San Jose. His father's home was only approximately 15 minutes off of the route Towle would take back and forth to work. Cox thought Towle called his father "two or three times a year." Cox remembered four occasions when the decedent's daughter visited him in thirty years. She did not remember the decedent's daughter calling. Cox felt that the families were completely separate after the divorce and that the decedent essentially became part of his second wife's family. She said her stepfather had been "very upset" when he found out that his biological children were no longer using his name.
Towle and Virginia Towle provided testimony that conflicted with Cox's testimony regarding family relationships and the way the decedent wrote documents. Virginia Towle testified that the decedent loved his biological children and that she and her children socialized with the decedent "constantly." "He was invited to everything and anything that had to do with graduation, special performances in school.... There was constantly baptisms and weddings.... [We] were always there together." Virginia Towle explained that Cox "never" attended those events and that the decedent never discussed Cox. Virginia Towle continues her relationship with the decedent's remaining siblings. She testified that the funeral was not held for the decedent because "no one was interested and it seemed why, there was no one to go to it."
Virgina Towle testified that she had never seen the decedent print anything and that "any letters, documents and things were always written" rather than being printed. Additionally, Virginia Towle had asked the decedent about making a will at "a party about ten years ago." She explained, "I said, have you done anything about the will and the property? He said I'll do it, I'll do it. I go, you have to. What about the house? He said it goes to Gail and Eric."
Towle testified that he "had a very good relationship with [his] father." He did not see him regularly because "I was in a very busy phase of my life, and he basically, like many elderly people, became much more *41 bound to his routines, and the list of things he would do got shorter and shorter." According to Towle, the relationship was not "estranged" and the decedent sent Towle and his sister "birthday and Christmas cards every year." The cards to Towle were signed, "love, dad." He also sent his grandchildren "cards and gifts." Towle testified that Cox's relationship with the decedent was not close. "He never talked about her and she seemed to be living a separate life.... [T]here was nothing they ever did together." Pictures introduced during Towle's testimony depicted the decedent with his biological children and their families at family events such as a wedding and a christening.
Towle testified that he had never seen his father write any documents in block letters similar to that in the purported holographic will. He introduced credit cards, checks, and identification cards, all of which the decedent had signed in cursive. Towle identified the signatures on those documents as his father's.

ANALYSIS

Standard of Review
"It is `a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' This rule has been specifically applied by the California Supreme Court to the interpretation of wills." (Estate of MacLeod (1988) 206 Cal.App.3d 1235, 1243, 254 Cal.Rptr. 156 (MacLeod), quoting Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839.) Where an issue can be determined from evaluating the document on its face, and by reference to applicable law, we can make such determination independently of the lower court. (Estate of Morgan (1927) 200 Cal. 400, 402, 253 P. 702; Estate of Black (1982) 30 Cal.3d 880, 883, 181 Cal.Rptr. 222, 641 P.2d 754.) "Where, however, extrinsic evidence is properly received, and such evidence is conflicting and conflicting inferences arise therefrom, the appellate court will accept or adhere to the interpretation adopted by the trial court provided that that interpretation is supported by substantial evidence." (Estate of Ehrenfel (1966) 241 Cal.App.2d 215, 222, 50 Cal.Rptr. 358; Parsons v. Bristol Development Co., supra, 62 Cal.2d pp. 865-866, 44 Cal.Rptr. 767, 402 P.2d 839.) "It is for the probate court in the first instance to say whether the document was `signed' by the decedent, and its determination will not be disturbed unless it is without support of the evidence." (Estate of Kinney (1940) 16 Cal.2d 50, 54, 104 P.2d 782.) Where, as here, there are no written findings by the trial court, we presume the court made all findings necessary to support the order. (Schubert v. Reynolds (2002) 95 Cal.App.4th 100, 104, 115 Cal.Rptr.2d 285.)

The Holographic Will Statute
Section 6110 of the Probate Code provides that a formal will must be witnessed. However, section 6111 further provides that if a will does not comply with section 6110, it is nonetheless "valid as a holographic will, whether or not witnessed, if the signature and the material provisions are in the handwriting of the testator." (§ 6111, subd. (a).) Section 6111.5 provides that "[e]xtrinsic evidence is admissible to determine whether a document constitutes a will pursuant to Section 6110 or 6111, or to determine the meaning of a will or a portion of a will if the meaning is unclear."
The primary purpose of the holographic will statute is to prevent fraud by requiring that the material provisions be in the testator's writing. (Estate of *42 Southworth (1996) 51 Cal.App.4th 564, 59 Cal.Rptr.2d 272.) "Whether a document should be admitted to probate as a holographic will depends on proof of its authorship and authenticity, and whether the words establish that it was intended to be the author's last will and testament at the time she [or he] wrote it." (Id. at p. 571, 59 Cal.Rptr.2d 272.) "Courts are to use common sense in evaluating whether a document constitutes a holographic will." (Id. at p. 570, 59 Cal.Rptr.2d 272; Estate of Black, supra, 30 Cal.3d at pp. 885-886, 181 Cal.Rptr. 222, 641 P.2d 754.)
As the Supreme Court observed in Estate of Black, supra, 30 Cal.3d 880, 181 Cal.Rptr. 222, 641 P.2d 754, "`[t]he policy of the law is toward "a construction favoring validity, in determining whether a will has been executed in conformity with statutory requirements." [citations].'" (Id at p. 883, 181 Cal.Rptr. 222, 641 P.2d 754.) The high court affirmed "`"the tendency of both the courts and the Legislature ... toward greater liberality in accepting a writing as an holographic will ... Substantial compliance with the statute, and not absolute precision is all that is required. ..."' [Citation.]" (Ibid., italics in text; see also Estate of Baker (1963) 59 Cal.2d 680, 683, 31 Cal.Rptr. 33, 381 P.2d 913.)

The Signature Requirement
Appellant's primary argument is that the will was not a holographic will because it did not contain a valid signature. Since the trial court admitted the holographic will to probate, we must presume that the court found it complied with the statute requiring that "the signature and the material provisions are in the handwriting of the testator." (§ 6111.) Two components of the signature requirement are relevant here: the location of the name in the document, and whether the testator's use of block letters constituted his signature.

A. Location of the Signature
There is no requirement that the signature on a holographic will must be at the end of the document, so long as it appears from the document itself that the signature was intended to authenticate the document. "It is settled in California that the signature need not be located at the end but may appear in another part of the document, provided the testator wrote his name there with the intention of authenticating or executing the instrument as his will." (Estate of Bloch (1952) 39 Cal.2d 570, 572-573, 248 P.2d 21.)
Several cases illustrate this rule. In Estate of Morgan, supra, 200 Cal. 400, 253 P. 702 (Morgan), a hand-written document found after the decedent's death contained her name only twice and was not signed at the end of the document. The court found that this did not render the document invalid as a will. "If the words `Last will and testament of Ynez Morgan' appeared at the end of the will, all doubt that the signature was intended to be and was adopted as the final executing signature in authentication of and in execution of the document as a completed testamentary act would be removed. Looking at the instrument as a whole, we are of the view that, by the use of these words in the beginning of the instrument, it was the intention of the testatrix to thereby execute the document as a will." (Id. at pp. 402-103, 253 P. 702.)
Similarly, in Estate of Brooks (1931) 214 Cal. 138, 4 P.2d 148 (Brooks), the decedent included her name only in the first sentence of her will. The court found that "[t]he first sentence `This is my will-Elizabeth Ryan Brooks' has probative force to uphold the inference that the name of the decedent was written with the intention of *43 evidencing the feet that the document was her fully executed completed will." (Id. at p. 141, 4 P.2d 148.) While there were other factors that supported a contrary inference that the will was incomplete such as the lack of a period at the end, two blank lines between two of the clauses, the failure to name an executor, and the fact that the writing ended abruptlythe court in Brooks found it could not say as a matter of law that the will before it was not complete. The court therefore upheld the finding of the lower court. (Id. at pp. 141-142, 4 P.2d 148.)
In the holographic will before us, similar to those in Brooks and Morgan, the testator did not include his name at the end of the document. However, the evidence on the face of the document as a whole supports a finding that the name was placed with the intention of authenticating the document. The phrase "Last Will ... of Homer Eugene Williams" located at the top of the document is almost identical to the title of the holographic will in Morgan. In addition, there are other factors indicating that the document was complete. Cases have shown that completeness is highly relevant in determining if the name was written with an intent to authenticate the document.
"From the earliest consideration of the question, completeness of the testamentary declaration has been deemed sufficient evidence of the `signing' of the writing, even though the declarant's name was written by him at a place other than the end." (Estate of Kinney, supra, 16 Cal.2d at p. 56, 104 P.2d 782 (Kinney).) In Kinney, the name of the decedent is included in only one location, after the date at the top of the page. The first sentence states, "I Anna Leona Graves Kinney, do bequeath all my possessions to my four sisters who were living in 1923." (Id. at p. 52, 104 P.2d 782.) The court noted that two characteristics indicated the document was complete. First, "[i]t was written with studied care, indicated by the fact that the decedent copied into her will the names and addresses of her sisters who were living at the time stated...." (Id. at p. 55, 104 P.2d 782.) Second, "[t]he fact that sufficient space remained on the paper to include additional writing if the decedent intended any further declaration is also some evidence of finality and completeness." (Ibid.) The court concluded: "The writing here involved appears to be a complete testamentary declaration." (Ibid.)
The document before us has similar indicia of completeness. First, the decedent took the time, "with studied care," to list the addresses of those people included in the will: Cox, his sister-in-law, and his nephew. (Kinney, supra, 16 Cal.2d at p. 55, 104 P.2d 782.) He also wrote down his own address. Second, as in Kinney, there was sufficient room at the end of the document for the decedent to write more if he had wanted to do so. Another characteristic indicating completeness was the age of the document. Here the inference could be drawn from the property values stated in the document that it was written a number of years ago. Cox testified that she found it in the decedent's center desk drawer, where it was readily available had he wanted to change or add to it. All of this evidence reasonably supports the conclusion that "the writer had done everything that he intended to do." (Estate of Brooks, supra, 214 Cal. at p. 140, 4 P.2d 148, italics in original.)
The case before us differs from Estate of Bernard (1925) 197 Cal. 36, 239 P. 404, in which the document clearly appeared to be unfinished. There the court wrote: "The abrupt termination of the document near the middle of the last page is a strong indication of decedent's intent to do something *44 more in order to make it a complete will." (Id. at p. 40, 239 P. 404.) In contrast, here the decedent appointed an executor, disposed of his collectables, listed assets for reference, and then indicated his intention for the house. Unlike the will in Brooks, supra, the document ended with a period. (See also Estate of Block, supra, 39 Cal.2d at p. 575, 248 P.2d 21 (Block) [court noted that the document appeared to have a period at the end when determining if it was complete].)
From an evaluation of the whole document in the case before us, it appears that the name at the top of the document was intended as a mark of execution. By comparison, the Supreme Court in Estate of Block, supra, 39 Cal.2d 570, 248 P.2d 21 found a will that was written on two sides of an envelope to be properly executed, where the testator's name appeared only once in the document, and neither at the bottom nor the top, but rather as part of a description of bonds to be distributed. The document listed the amount of the bonds following the phrase, "Bonds belonging solely to Helene I. Bloch...." (Id. at p. 572, 248 P.2d 21.) Although it appeared that the testator had used her name to describe the property, the court found that it could also serve as a signature authenticating the will. The court in Bloch held: "Since it appears that the holographic document written by Mrs. Bloch is a complete testamentary instrument, it follows, under the decision in Estate of Kinney, supra, 16 Cal.2d 50, 56 [104 P.2d 782], that her name is to be regarded as having been written in the body of the instrument with authenticating intent." (Id. at p. 576, 248 F.2d 21.) The Supreme Court in Bloch observed that "courts of this state have been very liberal in sustaining the validity of holographic wills which appear to be complete testamentary documents although signed elsewhere than at the end." (Estate of Block, supra, 39 Cal.2d at pp. 574-575, 248 P.2d 21.) The court then cited a number of cases in which wills were upheld where the testator's name appeared in the title or somewhere other than at the end of the document. (See Estate of Brooks, supra, 214 Cal. 138, 140-141, 4 P.2d 148; Estate of Wallace (1950) 100 Cal.App.2d 237, 239, 223 P.2d 284; Estate of Gardener (1948) 84 Cal.App.2d 394, 396-397,190 P.2d 629; Estate of Kaminski (1941) 45 Cal.App.2d 779, 781-782, 115 P.2d 21; Estate of Bauman (1931) 114 Cal.App. 551, 553 et seq., 300 P. 62;; Estate of Sullivan (1928) 94 Cal.App. 674, 677, 271 P. 753; Estate of England (1927) 85 Cal.App. 486, 488, 259 P. 956.
Under the foregoing cases, the document before us provides sufficient indicia of completeness from which to conclude that the name at the top was intended to be a mark of authentication. "`When the name is used to identify the decedent as the author of the alleged will ... or to identify the instrument as decedent's will ... and in addition the instrument appears to be a complete testamentary document, it may reasonably be inferred that the name was placed where it was with the intention of executing the instrument. In such cases the name is linked to the alleged testamentary act and the probabilities that it was intended as a signature are strong.'" (Estate of Rowe (1964) 230 Cal.App.2d 442, 447, 41 Cal.Rptr. 52.)

B. Form of the Signature
Appellant contends that the decedent's name at the top of the document is written in block letters, and therefore, cannot be considered a signature. This argument is based upon the decision in Estate of Twohig (1986) 178 Cal.App.3d 555, 223 Cal.Rptr. 352 (Twohig). Twohig concerned a handwritten codicil to an executed *45 formal will. However, the testator failed to sign the codicil. The court reasoned that the unsigned codicil could not incorporate the formal will by reference because it was not itself a complete testamentary document since it lacked a signature. The court explained that "[w]hile the courts have been liberal with regard to the form and location of the signature within the holograph [citations] they have not condoned its absence." (Id. at p. 560, 223 Cal.Rptr. 352.) The court further found that the two documents could not be deemed integrated because one was holographic and one was not, and the holographic document altered the provisions of the formal document. The court concluded that the codicil could not be admitted into probate because it was unsigned.
Our case is distinguishable from Twohig. In Twohig, the codicil did not include the testator's name at all. There was therefore no authenticating mark from which an intent to execute the document could be inferred. Further, it appeared that the testator had intended to sign it because he wrote "signed" on a particular date. Thus, unlike our case, the document on its face tended to show that there was something else the testator intended to add before the document was complete, namely his signature. Finally, there was no issue in our case that the document attempted to modify a valid will. The holographic will in our case was the testator's only expression of his testamentary wishes.
Appellant asserts that the block letters at the top of the document are not in the form the decedent used to sign legal documents and, therefore, it must be found that the document was not properly executed. However, several cases illustrate that the way a testator signs a holographic will does not need to be identical to a signature used to sign other legal documents. In Estate of Morris (1969) 268 Cal.App.2d 638, 640, 74 Cal.Rptr. 32 (Morris), the court found that "[t]he use of the initials as a signature was an effective signing of the will. [Citations.]" The words, "Love from `Muddy'," signed at the end of a holographic will in the form of a letter, were also considered a valid signature. (Estate of Button (1930) 209 Cal. 325, 328, 334, 287 P. 964 (Button).) And similarly, in Estate of Henderson (1925) 196 Cal. 623, 634, 238 P. 938 (Henderson), the court found the phrase "Your loving mother" constituted a valid signature.
Morris, Button, and Henderson demonstrate that the name on a holographic will does not need to be a legal signature to validly authenticate the will. Therefore, appellant's evidence that the decedent signed checks, credit cards, and identification cards in a different manner does not require a finding that the will was invalid. MacLeod, supra, 206 Cal.App.3d 1235, 254 Cal.Rptr. 156, further supports respondent's position that the document need not be written in the manner customarily used by the decedent in other legal documents. In MacLeod, the decedent's will was not dated, was written in several colors of ink, and contained corrections and writing in the margins. The only place a name appeared at all was by means of a caret mark in the first sentence. The decedent's son contested the admission of the will into probate based in part on the fact that he believed "that given [the decedent's] character she would not have intended the unsubscribed, scribbled and interlineated document found at her bedside to be her will. [Her son] believed the document was no more than an unsigned working paper executed without testamentary intent." (Id. at p. 1240, 254 Cal.Rptr. 156.) The court rejected this argument. The court found: "While the document may not reflect [the decedent's] usual care with important legal documents, and while *46 it may have been changed from time to time, even with the intent perhaps at some future time to formalize the will, we do not believe this detracts from the conclusion [the decedent] intended the document, at any given time, to be her will. [Citations.]" (Id. at p. 1241, 254 Cal.Rptr. 156.)
As we noted above, the primary purpose of the requirement that a holographic will be in the testator's handwriting is to prevent fraud and counterfeit. (Estate of Southworth, supra, 51 Cal.App.4th 564, 59 Cal.Rptr.2d 272.) Here there was testimony from Cox, who had lived with the decedent for a number of years, that he normally wrote in block letters and often left notes signing his name in this manner. Such evidence supports a finding, implied in the trial court's order admitting the will to probate, that the decedent's name in block letters at the top of the holographic will was written by him and constituted a signature for purposes of authenticating the will.

Other Evidence of Testamentary Intent
"Before an instrument may be admitted to probate as a will, it must appear from its terms, viewed in the light of the surrounding circumstances, that it was executed with testamentary intent. [Citations.]" (Estate of Geffene (1969) 1 Cal.App.3d 506, 512, 81 Cal.Rptr. 833.) Therefore, we must evaluate whether there was substantial evidence supporting a finding that the holographic document was intended to be a testamentary document. It is established that "`"[n]o particular words are necessary to show a testamentary intent. It must appear only that the maker intended by it to dispose of property after his death, and parol evidence as to the attending circumstances is admissible." [Citation.]'" (Estate of Spitzer (1925) 196 Cal. 301, 307, 237 P. 739 (Spitzer).)
Appellant contends that three characteristics of the will undermine the conclusion that the document is testamentary. First, he asserts that the title "Last Will Etc. or What?" creates an ambiguity and implies that the decedent was unaware of what he was writing. Second, he contends the failure of the document to dispose of all of the decedent's property indicates it is not testamentary in nature. Third, appellant asserts that the statement "I would like ..." in the provision regarding the house (italics added) is ambiguous and does not clearly demonstrate an intent on the part of the decedent to dispose of his property. We address each of these contentions separately.
In determining whether the language of a document is so unclear as to undermine testamentary intent, Estate of Smilie (1950) 99 Cal.App.2d 794, 222 P.2d 692 (Smilie) provides guidance. In that case, the court evaluated a letter from the decedent. The letter contained these sentences: "I want you to see that all my bills are paid and that Dot does not get thing. I want you to have all of my after my bill are." (Id. at p. 796, 222 P.2d 692.) The trial court found the document expressed a testamentary intent and construed these sentences to read: "I want you to see that all of my bills are paid and that Dot does not get a thing. I want you to have all." (Id. at p. 797, 222 P.2d 692.) The Court of Appeal upheld the lower court's construction of the will. The court explained that "the trial court arrived at this construction on the theory that the words that were stricken were mere surplusage." The court found that the lower court's interpretation was "not unreasonable," was "in accord with the recognized rules of construction," and that circumstances showed that it "carrie[d] out the obvious intent of the testator to dispose of his entire estate." (Id. at p. 800, 222 P.2d 692.) "In *47 determining whether the instrument propounded was intended to be testamentary, reference will be had to the surrounding circumstances, and the language will be construed in the light of these circumstances. If it shall then appear that the instrument was intended to be testamentary, the court will give effect to the intention, if it can be done consistently with the language of the instrument and the particular form of the instrument is immaterial." (Id. at pp. 799-800, 222 P.2d 692.)
"`"The true test of the character of an instrument is not the testator's realization that it is a will, but his intention to create a revocable disposition of his property to accrue and take effect only upon his death and passing no present interest." [Citation.]'" (Spitzer, supra, 196 Cal. at pp. 307-308, 237 P. 739.) In the instant case, the text of the document indicates that the intent of the decedent was to dispose of his property upon his death. As in Smilie the parts of the text that are confusing or extraneous, such as the words "Etc. or What?" can be ignored as surplusage in order to uphold the intent of the decedent. Intent is demonstrated on the face of the document by the use of the words "Last Will" in the title, the naming of an executor, and the disposal of identified property. The decedent clearly contemplated that the identified property would be disposed of after his death.
Similarly, the inclusion of instructions regarding the decedent's wishes upon a serious illness, and the mention of Deborah Cox as having his power of attorney, which would normally be provisions that would be made effective during the person's lifetime, could also have been properly ignored by the trial court. In Estate of Sargavak (1950) 35 Cal.2d 93, 216 P.2d 850, the decedent wrote a letter shortly before her death that included testamentary and non-testamentary provisions. The court held that the decedent "decided to leave her property to two men she had known for more than forty years and for whom she had demonstrated a warm personal affection. This purpose is clearly expressed by the terms of the instrument. It is not negatived by evidence that she had an additional purpose, expressed in the letter and corroborated by the testimony upon which contestants rely.... The inclusion of nontestamentary provisions with those of a testamentary nature does not make the instrument inoperative as a will." (Id. at p. 101, 216 P.2d 850.) In our case as well, the non-testamentary provisions, and the decedent's uncertainty about the proper title, do not serve to make the instrument inoperative as a will.
Appellant's second contention is that the will is invalid because it does not dispose of all of the decedent's property. However, in Estate of Rowe, supra, 230 Cal.App.2d 442, 41 Cal.Rptr. 52, the court found a holographic will to be valid that did not dispose of all of the decedent's property. In Rowe, "Mrs. Rowe did not dispose of some $70,000 worth of personal property in the will ... under consideration." (Id. at p. 444, 41 Cal.Rptr. 52.) Yet the court reached the conclusion that "it appears that the testatrix has done everything that she intended to do...." (Id. at p. 445, 41 Cal.Rptr. 52.) The court held that the document was a valid holographic will despite the fact that it did not dispose of all of the decedent's assets and did not contain a signature at the end of the document. (Id. at p. 447, 41 Cal.Rptr. 52.)
In the case before us, the failure of the decedent to dispose of all of his property similarly does not compel a conclusion that the will is invalid or that the document lacks indicia of testamentary intent. Decedent specifically expressed a testamentary intent and disposed of some of his property. *48 In particular', the phrase, "All my collictables: everything including two pistols and two rifles, none fired: to nephew Kirk Bell ..." in combination with the title, "Last Will ..." indicates that the decedent had a testamentary intent.
Appellant next contends that the words "I would like," with regard to the house, do not shove testamentary intent, but are rather a suggestion or recommendation. Whether these words are construed as an expression of testamentary intent or a suggestion depends on whether they indicate an intended disposition of property after the testator's death, or whether they are directed to a beneficiary to make some further division or disposition of property. For example, in Estate of Cook (1943) 58 Cal.App.2d 376, 136 P.2d 338, the testator left everything to his wife and then wrote "[a]t her death I would like my sisters and brothers get at least 2000.00 each of my money and the balance to go to my daughter." (Id. at p. 377, 136 P.2d 338.) The court found in this case that the expression "I would like" expressed a request directed to the testator's wife, and not did not indicate a testamentary intent to limit the devise to the wife.
The court in Estate of Cook relied on Estate of Marti (1901) 132 Cal. 666, 64 P. 1071 (Marti). In Marti, the language of the will at issue was: "`Upon the death of my wife, I desire that one half of the property bequeathed to her shall be devised by her to my relatives.'" (Id. at p. 671, 64 P. 1071.) The court explained that "[t]he words themselves fall far short of a command or a direction, and are rather in the nature of an expression of the testator's feelings, arid a suggestion or recommendation to be considered by her in making a testamentary disposition of her estate, or as a reason to influence her therein. While the desire of a testator for the disposition of his estate will be construed as a command when addressed to his executor, it will not, when addressed to his legatee, be construed as a limitation upon the estate or interest which he has given to him in absolute terms." Similarly, in Estate of Ferdun (1949) 91 Cal. App.2d 622, 205 P.2d 456, the testator devised real property to her brother and then added a request to him as to what she wanted him to do with the property upon his death. The court found" that these directions about what the testator would like the devisee to do with the property were "precatory in nature" and did not create a testamentary trust. (Id. at p. 626, 205 P.2d 456.)
Unlike these cases, the language in the holographic will before us does not express a suggestion or wish to a legatee or devisee regarding the future disposition of property being devised. Rather it is an expression of the testator's intent as to the house he and his stepdaughter are living in, in the event of his death. It provides: "I would like my step daughter, Debra Cox, to be able to live in the house as long as she wants before putting it up for sale." There is no one else named in the will as a devisee of this property. It is reasonable to conclude that the phrase, "I would like," in this context is addressed to the executors of the estate, who had been previously identified in the document. Therefore, under the cases cited above, this phrase can be construed as an expression of testamentary intent, rather than a suggestion.[4]
*49 Finally, we note that the evidence presented at trial supported the finding that the document in this case was written with testamentary intent. Declarations of the testator are admissible to demonstrate a testamentary intent. (Estate of Spies (1948) 86 Cal.App.2d 87, 194 P.2d 83 (Spies).) In Spies, the decedent wrote a letter shortly before he died, directing the secretary of the union of which he was a member to change the beneficiary designation on his life insurance policy so that his niece, Patty Lou Smith, would be a one-half beneficiary. The letter was not delivered but was later found in the decedent's effects. The decedent's surviving siblings objected to the admission of this letter as a codicil to the decedent's will, arguing that it did not show sufficient testamentary intent. The court disagreed. The court noted the policy favoring construing a document as a valid will when the writing is "open to two constructions." (Id. at p. 89, 194 P.2d 83.) In construing the writing, the court looked not only at the four corners of the document but also considered extrinsic evidence. "If the prerequisite testamentary intent does not appear from the face of the instrument itself," the court wrote, "reference may be made to the circumstances of its execution, and the language will be construed in the light of those circumstances." (Spies, supra, 86 Cal.App.2d at p. 90, 194 P.2d 83.)
In Spies, a friend of the decedent's testified that he "frequently prefaced his remarks with `if anything happens to me'; that he referred to Patty Lou Smith by name and said that he loved her as if she were his daughter; that he was going to change the beneficiary of his will from his wife [who had predeceased him] to his niece. Such prior declarations of intent to make a will are admissible when the attempt is not to explain an ambiguity but to show the testamentary character of a letter. [Citation.] Thus the trial court properly concluded that the letter was testamentary in character and that the decedent had the requisite testamentary intent when he wrote and signed it." (Spies, supra, 86 Cal.App.2d at p. 91, 194 P.2d 83.)
In the case before us, Cox's testimony as to the decedent's express wishes upon his death provided evidence, similar to that in Spies, that the holographic document, which was consistent with those wishes, was "testamentary in character." (Spies, supra, 86 Cal.App.2d at p. 91, 194 P.2d 83.) Cox testified that the decedent had told her that he would make provision for her regarding the house if he died. She also testified that he asked her to be executor and that he told her he had "put us both [Cox and his sister-in-law] down as the executor for his will." As in Spies, testimony regarding the decedent's statements about his will and future intentions were admissible to demonstrate testamentary intent. This testimony, in addition to the title of the document as a "Last Will," the "studied care" with which the decedent set forth the names and addresses of those identified in the will (Estate of Kinney, supra, 16 Cal.2d at p. 55, 104 P.2d 782), the indicia of completeness of the document, and the express terms disposing of some of the decedent's property, all support a finding that the document was written with testamentary intent.

DISPOSITION
The orders are affirmed.
WE CONCUR: MIHARA and DUFFY, JJ.

*50 APPENDIX 1

*51 
NOTES
[1] Further unspecified section references are to the Probate Code.
[2] A copy of the holographic will, an attachment to the "Petition for Probate of Will and for Letters Testamentary [and] Authorization to Administer Under the Independent Administration of Estates Act" found at clerk's transcript pages 25-26, is attached as Appendix 1.
[3] Towle also appeals a June 16, 2006, minute order granting an ex parte application by Cox for clarification of issues. This is not an appealable order. (Code Civ. Proc, § 904.1.)
[4] We note that in this appeal we are only reviewing the order admitting the holographic will to probate. We express no opinion regarding the eventual interpretation or effect of this provision regarding the house, an issue that is left to be determined by the probate court in further proceedings before that court. We decide only that the language "I would like" in the context of the will is indicative of testamentary intent and not merely precatory.