Filed 12/17/20  Estate of Wagner CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Estate of ALLAN DAVID WAGNER, Deceased. | |
| DIANA QUINTANA, Petitioner and Appellant, v. LAURA BRENNAN, Objector and Respondent. | A154747 (Alameda County Super. Ct. No. RP17871276) |

Allen David Wagner died suddenly in 2017, unmarried, childless and without a registered domestic partner.  He was survived by his live-in partner of almost 30 years, Diana Quintana, and his relatives, including his sister, Laura Brennan.  Quintana petitioned the probate court to, among other things, admit into probate as Wagner's will a 2006 document that he prepared and signed as part of his renunciation of his right to serve as a personal representative of his mother's estate, and Brennan objected.  If the document is a will, Wagner's estate would be left to Quintana; if it is not, it would pass intestate to relatives, including Brennan.  The question before us is whether, contrary to the probate court's ruling, Quintana has shown by clear and convincing evidence that this 2006 document was Wagner's will.  We conclude that she has made this showing and reverse.

1

# BACKGROUND

## I.

### *Quintana's Petition*

In August 2017, Quintana filed a petition, which she later supplemented, in Alameda County Superior Court for the probate of a lost will regarding Wagner's estate, which she estimated had a value of $888,143. She asked the court to admit two possible wills into probate.

First, Quintana asked the court to admit a 2012 unsigned partnership agreement between Wagner and herself. In a supporting declaration, she stated she had been Wagner's "life partner" since 1989, and that they often had told each other that they wanted all their worldly possessions to go to the other upon their death. In December 2011, they discussed formalizing this commitment in a written partnership agreement, including with friends such as Michael Mitchner and Paulette Landry. Working from an online form, they drafted a Domestic Partnership Agreement (2012 Agreement). It stated that neither had any rights regarding the real or personal property owned by the other, but that, "in the event of death," "[t]he total owned by one partner shall transfer to the other without question."

Quintana stated that she and Wagner signed the 2012 Agreement in January 2012 and filed it away in a box with other important papers. However, she attached only an unsigned copy of the 2012 Agreement to her declaration. She wrote that the couple accidentally disposed of the only signed version after a water leak in their garage had caused boxes stored there to become water soaked and moldy. The couple disposed of these boxes, and Quintana did not discover until after Wagner's passing that among them had been the box containing the signed 2012 Agreement. She printed out an

2

unsigned copy of the 2012 Agreement from the family computer on which she and Wagner had drafted it.

Mitchner and Landry, long-time friends of Wagner, also submitted supporting declarations. Mitchner stated that Wagner and Quintana had a decades-long, close and loving relationship; that in December 2011, Wagner told Quintana regarding the 2012 Agreement, " 'If anything ever happens to me everything is yours"; that in early 2012, Wagner told Mitchner "the paperwork had all been signed"; and that Mitchner had "absolute certainty that [Wagner] had every intention that his estate go to Diana Quintana." Landry stated that Wagner and Quintana "were a loving and devoted couple" who in December 2011 told her they were going to draft and sign an agreement to leave each other all that they owned. In January 2012, Wagner showed her the signed 2012 Agreement "and said words to the effect that 'Diana will not have to worry if something happens to me.' "

Quintana subsequently supplemented her petition to contend that she recently had discovered a typed document entitled "September 2006 RENUNCIATION" regarding the "Estate of Margaret Rita Wagner" (2006 Renunciation). Quintana stated that Wagner's mother had died in September 2006, and Wagner "did not want to serve as Executor because the estate was heavily loaded with debt and he was worried that if the estate did not have enough money to pay the debt that he would become personally liable for the debt." She further stated that Wagner sent the 2006 Renunciation to his mother's Personal Representative, "reiterating his renunciation of his parent's estate and stat[ing] that all his assets would transfer upon his death to me. [Wagner] wanted to make his testamentary intent clear to his family by telling them that upon his death everything that

3

he had in life was being given to me." She attached a signed copy of the 2006 Renunciation to her supporting declaration. The body of it states:

"I Allan David Wagner in Renunciation of this Estate. If anything should happen to me while or after this estate is settled. All my personal property and everything that is mine and in my possession, including all property financial and otherwise would transfer to my wife Diana Marie Quintana. . . . In declining to be representative in this matter no assets or property of Robert Lee or Margaret Rita Wagner, my parents shall not be a burden to myself or my spouse/partner Diana Marie Quintana. I control only my property which will transfer without question to Diana in the event of my death. No debt or property held by my parents shall transfer to myself or Diana. I decline to be responsible for any debt owed and have no responsibility."[1]

Quintana also declared that on October 2, 2006, Wagner "signed a notarized document entitled 'Renunciation' with regard to his declination to serve as the personal Representative" of his mother's estate." She attached to her declaration a copy of this second renunciation document. The document, notarized in Pennsylvania, states, "And now, comes Allan Wagner, Personal Representative of the Estate of Margaret Rita Wagner, deceased September 25, 2006, and he renouncing any right to be appointed Personal Representatives concerning his mother's estate, and he further consents to the appointment of his sister, Lynn Chadderton, as Personal Representatives in his stead."

Quintana argued that the court should admit into probate as Wagner's will either the 2012 Agreement or the 2006 Renunciation.

---

[1] We quote from documents and elsewhere in the record as the language appears, without correction.

4

***The Evidentiary Hearing Regarding Quintana's Petition***

In April 2018, the court held an evidentiary hearing to determine whether the 2006 Renunciation or the 2012 Agreement should be admitted into probate as Wagner's will.  The hearing focused on whether the court should admit either document under Probate Code section 6110 (section 6110).  Section 6110 provides that a will "shall be in writing" and "shall be signed."  (§ 6110, subds. (a), (b).)  Furthermore, a will "shall be witnessed by being signed" unless "the proponent of the will establishes by clear and convincing evidence that, at the time the testator signed the will, the testator intended the will to constitute the testator's will."  (§ 6110, subd. (c)(1), (2).)  Quintana presented the testimony of several witnesses, as well as certain documents.  Brennan did not present any evidence.

## A.  Testimony by Friends of Wagner and Quintana

Mitchner and Landry provided testimony that was consistent with their declarations.  They focused on Quintana and Wagner's longstanding, close and loving relationship and the couple's discussion and creation of the 2012 Agreement around the 2012 New Year.  Neither Mitchner nor Landry testified about reviewing the content of a signed copy of the 2012 Agreement, but Landry testified that soon after the 2012 New Year, Wagner showed her an agreement that was signed.  Both also testified that Wagner was not close to his family and that none of his family members attended his funeral.  A third friend also testified that Quintana and Wagner had a longstanding, close and loving relationship.

## B.  Quintana's Testimony

Quintana also gave testimony that was consistent with her declarations.  She testified that Wagner, she and her then almost four-year-

old daughter began living together about two months after she and Wagner met in 1989. Wagner worked for a water district, eventually as a water treatment supervisor. He retired and then returned to work until he died. Quintana worked and went to school. The couple rented their home until 2009, when they purchased a house in Fremont, California. Although in 1990 Wagner asked and received her mother's permission to marry Quintana, they did not marry because "[w]e got so busy in life."

Regarding the couple's finances, Quintana testified that Wagner's work compensation eventually reached six figures a year, while Quintana's was as high as $70,000 a year. She and Wagner "put in together on everything from the very beginning." At first, they kept separate checking accounts, but then shared one account. They split equally the cost of the rent and, later, the mortgage, but the house was purchased in Wagner's name "for tax purposes." They also split equally the rest of their expenses, such as for groceries and utilities. They both took care of her daughter, and together paid for the child's college education. As indicated in the 2012 Agreement, they agreed that, "while we are living and breathing and on God's green earth, we kept everything the same way we have always done because it worked for us," but that, should one of them die, "then the other would have totally every possession" of the other. Wagner also agreed to take care of Quintana's daughter in the event of Quintana's death.

Evidence was also introduced that Wagner filed paperwork with his lender authorizing Quintana to make decisions about his account, gave their homeowner's association permission to discuss all residence matters with her, and referred to her as his "spouse" or "wife" in loan and other documents. Quintana testified that Wagner introduced her as his "wife" and she introduced him as her "husband."

6

Quintana further testified that when Wagner was preparing to retire, he discussed with her that he wanted to designate Quintana and Wagner's sister, Brennan, as co-beneficiaries of his retirement account. He told her that he was going to designate his sister as a beneficiary "because he was the only one left standing." Quintana testified that she understood the retirement account would be divided equally between her and Brennan, and that she told Wagner this was "fine." The record indicates Wagner memorialized this beneficiary designation in July 2012.

Quintana also testified about her recollection of the context in which Wagner created the 2006 Renunciation. Wagner's mother, who lived in Pennsylvania, had asked Wagner to be the representative of her estate if she passed away because she was fighting with Wagner's sisters; his mother also wanted to deed her house to him "because he would know how to handle everything." When Wagner's mother passed away, Wagner found out "there was a lot of debt" and a "lot of things he didn't know about [and] didn't want to have anything to do about." Wagner was under the impression that whoever would be appointed the personal representative of his mother's estate would have some personal liability for those debts. He told Quintana, " 'I have to put an end to this. We don't want to be involved in it.' " Quintana further testified that, "because our lives were so commingled together, he didn't want me to have to be paying for that debt, and he didn't want to pay for it himself. Because what we built, we built. What they built, they had. He didn't think it was fair that it got involved me [*sic*] or it even involved him because they wouldn't listen to him."

Quintana recalled seeing Wagner drafting the 2006 Renunciation in September 2006, but she saw only the first part of it. At the time, she understood Wagner intended to leave everything to her as they had agreed.

She found a copy of the 2006 Renunciation with the other renunciation document and a deed to Wagner's mother's house, all of which were "with his important papers to what happened with his mother's estate." She understood the original of the 2006 Renunciation had been mailed to the personal representative for the mother's estate "[o]r to the people who did the renunciation."

Quintana also testified that Wagner was never close to his blood relatives and that none of his family members attended his funeral. She claimed that when she reached Brennan after Wagner's death, Brennan "said she didn't want to have anything to do with our life." Quintana understood that Brennan was confined to a wheelchair and was paralyzed from the waist down but Quintana still was "stunned" that Brennan did not attend Wagner's funeral.

### C. Quintana's Daughter's Testimony

Quintana's daughter testified that Wagner had been in her life for as long as she could remember. Asked about her relationship with him, she said, "He was my dad." During her childhood and young adult years, they did things together "[a]ll the time," including going to dinner and camping. She recalled him saying he wanted to leave everything to Quintana, and she said that Wagner "always took care of us." She said Wagner had gone back to see his family in Pennsylvania about five times, recalled his mother visiting "a long time ago" and recalled "the family" coming to visit one time. She remembered that Wagner did not like one sister's significant other, and that he never talked to his nieces or nephews.

## III.

### *The Court's Order and Quintana's Appeal*

After hearing argument from counsel, the court took the matter under submission. It subsequently issued a written order denying Quintana's petition. The court did not reject Quintana's contentions, however. Rather, it concluded that, "[g]iven the number of witnesses who testified that [Wagner] had said that he wanted to take care of [Quintana] should he precede her in death," Quintana had "arguably" proven by the preponderance of the evidence that Wagner had never intended to revoke the 2006 Renunciation, and that it constituted his will. However, Quintana had not proven this by the requisite clear and convincing evidence standard established under section 6110, subdivision (c)(2). The court reasoned, "The evidence at trial was that throughout their long relationship, [Wagner and Quintana] kept their property separate and shared equally in household expenses, including their mortgage payments on their home which was in [Wagner's] name only. The fact that each had their own separate property seems inconsistent with the idea that after his death, [Wagner] wanted [Quintana] to inherit his separate property." Furthermore, "[t]he evidence at trial was that [Wagner] has a presumably significant retirement account with his employer due to his long employment with the [water district]. Upon his death, half of that account would go to [Quintana] and the other half would go to [Wagner's] physically disabled sister, Laura Breman [*sic*]." This beneficiary designation "unambiguously contradicts all of the testimony that [Wagner] wanted everything to go to [Quintana] upon his death and creates substantial doubt as to [Wagner's] actual intent at the time he signed . . . [the 2006 Renunciation] . . . . Therefore, this Court cannot conclude that [Quintana]

9

proved by clear and convincing evidence that at the time decedent signed . . . the original of [the 2006 Renunciation] . . . . [h]e intended [it] to be his will.”

## DISCUSSION

## I.

### *Standard of Review*

Quintana argues we should independently review whether Wagner executed the 2006 Reconciliation with testamentary intent, while Brennan argues we should determine only if substantial evidence supports the court's order rejecting Quintana's request that the 2006 Reconciliation be admitted into probate as Wagner's will. Quintana is correct. Brennan, rather than contest any of the extrinsic evidence, argues only about what it signifies and what inferences should be drawn from it, and the probate court's order indicates it thought Quintana may well have proved her contentions, if only by a preponderance of the evidence. As one court held in similar circumstances, “[w]hile here extrinsic evidence was admitted, it was uncontradicted (even though subject to conflicting inferences [see *Parsons v. Bristol Dev. Co.* [1965] 62 Cal.2d 861, 866, fn. 2]), thus this court has the responsibility of independently determining whether the . . . instrument was executed with testamentary intent. ([*Id.* at p.] 866; *Estate of Wolfe* [1968] 260 Cal.App.2d 587, 591-592; *Estate of Kane* [1965] 236 Cal.App.2d 51, 53.)” (*Estate of Geffene* (1969) 1 Cal.App.3d 506, 512; accord, *Estate of MacLeod* (1988) 206 Cal.App.3d 1235, 1241 [where extrinsic evidence is not in conflict, the appellate court must “independently decide whether the document offered . . . was executed with testamentary intent”].) Therefore, we will independently review whether Quintana showed by clear and convincing

10

evidence that Wagner executed the 2006 Reconciliation with testamentary intent.[2]

## II.

### *The Law Regarding Testamentary Intent*

As we have discussed, section 6110 provides that a document will be admitted into probate as a will only if it is witnessed, unless "the proponent of the will establishes by clear and convincing evidence that, at the time the testator signed the will, the testator intended the will to constitute the testator's will." (§ 6110, subd. (c)(2).) Section 6110 "reflects a judgment that the formalities should not be allowed to defeat the testator's intent when clear and convincing evidence satisfies the evidentiary concerns underlying the formalities of the statute of wills." (*Estate of Duke* (2015) 61 Cal.4th 871, 893.) "The clear and convincing standard ' "requires a finding of high probability . . . . ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " ' " (*Estate of Ben Ali* (2013) 216 Cal.App.4th 1026, 1037.)

"The question of the intention of the parties as to the effect of the instrument as . . . a testamentary instrument is a question of fact." (*Halldin v. Usher* (1958) 49 Cal.2d 749, 752.) The instrument "must appear from its terms, viewed in the light of the surrounding circumstances, that it was executed with testamentary intent. The testator must have intended, by the particular instrument offered for probate, to make a revocable disposition of his property to take effect upon his death." (*Estate of Sargavak* (1950) 35 Cal.2d 93, 95; see also Prob. Code, § 6111.5 ["Extrinsic evidence is

---

[2]  Even if we were to review the court's ruling for substantial evidence, we would reach the same conclusion for the same reasons. That is, we would reverse the court's ruling because there is no substantial evidence to support it.

admissible to determine whether a document constitutes a will pursuant to Section 6110"].)  Nonetheless, "*evidence of present testamentary intent provided by the instrument at issue is paramount.*"  (*Estate of Southworth* (1996) 51 Cal.App.4th 564, 571-572 [regarding a holographic will].)  On the other hand, "[i]f the informal document fails to disclose testamentary intent, and merely expresses a desire or future intention, . . . it cannot be given effect as a will.  In other words, it must appear that the decedent intended to make a testamentary disposition by that particular paper, and if this cannot be shown it is immaterial that his testamentary intentions were in conformity with it."  (14 Witkin, Summary of Cal. Law (11th ed. 2017) Wills and Probate, § 175.)

We are "concerned not with the meaning of the instrument, but with the intention with which it was executed."  (*Estate of Sargavak, supra,* 35 Cal.2d at p. 96; *Estate of Smith* (1998) 61 Cal.App.4th 259, 270 [" 'Testamentary intent' . . . means the testator's general intent to make a revocable disposition of . . . property"].)  "No particular words are necessary to show testamentary intent but it must satisfactorily appear from the proffered document that the decedent intended by the very paper itself to make a disposition of his property after his death."  (*Estate of Geffene*, 1 Cal.App.3d at p. 512; *Estate of Button* (1930) 209 Cal. 325, 331 (*Button*) [" 'It must appear only that the maker intended by it to dispose of property after his death' "].)  " 'Thus, a letter or other informal document will be sufficient if it discloses the necessary testamentary intent, i.e., if it appears that the decedent intended to direct the final disposition of his property after his death.' "  (*Estate of Wong* (1995) 40 Cal.App.4th 1198, 1205.)  If so, " 'the particular form of the instrument is immaterial.' "  (*Estate of Williams* (2007)

155 Cal.App.4th 197, 212; accord, *Estate of French* (1964) 225 Cal.App.2d 9, 15.)

In short, " 'the true test of the character of an instrument is not the testator's realization that it is a *will*, but his intention to create a revocable disposition of his property to accrue and take effect only upon his death and passing no present interest.' " (*Button*, *supra*, 209 Cal. at p. 331.)

### III.

### *Analysis*

We conclude for multiple reasons that, as Quintana argues, the probate court erred in ruling that the 2006 Renunciation does not constitute Wagner's will. Therefore, we reverse.

First, the 2006 Renunciation's terms plainly show a testamentary intent, a matter ignored by the probate court even though, again, "*evidence of present testamentary intent provided by the instrument at issue is paramount.*" (*Estate of Southworth*, *supra*, 51 Cal.App.4th at pp. 571-572.) The parties do not dispute that Wagner typed and signed the 2006 Renunciation. On its face, it contains express statements indicating his unqualified intent that, should he pass away before *or* after his mother's estate was settled, all of his property would go to his "wife," Quintana. Specifically, the body of the 2006 Renunciation begins, "If anything should happen to me while or after this estate is settled. All my personal property and everything that is mine and in my possession, including all property financial and otherwise would transfer to my wife Diana Marie Quintana." It further states that, as a result of Wagner's renunciation, his parents' assets and property "shall not be a burden to myself or my spouse/partner Diana Marie Quintana. I control only my property *which will transfer without question to Diana in the event of my death*." (Italics added.) This language,

13

and particularly the phrase we have italicized, indicates that when Wagner wrote it, he intended that, should he die "while or after" his mother's estate was settled, all of his property would go "without question" to Quintana.

To the extent it may be argued that this language contains any ambiguity, the circumstances surrounding Wagner's writing and execution of the 2006 Renunciation confirm his testamentary intent. There is no evidence that Wagner feared his imminent death, but there was clear and convincing evidence that he feared future efforts before and after his death, by his relatives or mother's creditors, to use his property to settle his mother's debt—and that one of his purposes in preparing the 2006 Renunciation was to make clear that his property, rather than being any part of his family's assets, was separately owned by him and, after his death, would be inherited by Quintana. Quintana testified that Wagner wrote the 2006 Renunciation shortly after his mother died because he was concerned that, should he act as the personal representative of her estate, her creditors would pursue him personally regarding their claims against his mother. His concern, reflected in the language of the document itself, supports the conclusion that Wagner intended in 2006 that Quintana would inherit his property. It is apparent from these surrounding circumstances that his 2006 Renunciation was a statement to the world, and particularly to his relatives and his mother's creditors, that Wagner intended that, upon his death, whether before or after his mother's estate was settled, all of his own property would "transfer without question" to Quintana. These circumstances, together with the language we have highlighted, are clear and convincing evidence that Wagner intended the 2006 Renunciation to be an expression of his testamentary intent.

14

Other circumstances provide further support for this conclusion. Wagner and Quintana enjoyed a close and loving relationship for almost 30 years. Wagner repeatedly and consistently told friends that Quintana would receive all his property upon his death. He referred to Quintana as his wife or spouse, including in the 2006 Renunciation itself. Rather than keep Quintana away from his financial affairs, he authorized her to make decisions about them with his lender, and he authorized her to discuss residence matters with their homeowners' association. He and Quintana shared all expenses and raised her daughter together. He filed away the 2006 Renunciation in a box in the home they shared that Quintana could access.

The fact that Wagner did not label the 2006 Renunciation as a will or prepare it using the usual formalities for such a document (such as having his execution of it witnessed) is of no consequence, since " 'the particular form of the instrument is immaterial.' " (*Estate of Williams*, *supra*, 155 Cal.App.4th at p. 212.) Indeed, it is immaterial if Wagner did not realize the 2006 Renunciation constituted his will, as long as it evidences " 'his intention to create a revocable disposition of his property to accrue and take effect only upon his death and passing no present interest.' " (*Button*, *supra*, 209 Cal. at p. 331.) It plainly does.

Furthermore, that the 2006 Renunciation indicates multiple objectives—to renounce Wagner's right to be the personal representative of his mother's estate, to declare that his property did not belong to his family, and to provide that upon his death his property would be inherited by Quintana—does not call for a different result. In *Button*, our Supreme Court considered whether a single paragraph of another unlikely will—a four-page suicide letter that largely discussed other matters—was testamentary in

15

character. The decedent wrote the letter to her former husband on the day of her suicide, which was a few months after their divorce, and the letter was found in the same room as her body. (*Button, supra,* 209 Cal. at pp. 326-327.) In it, the decedent expressed deep regrets about her role in her family and implored her former husband to care for their two sons. (*Id.* at p. 327.) Toward the end of the second page, after she requested that she be cremated, she wrote, " 'You can have the house on 26th ave. and all the things of value so you won't be out any money on burying me.' " (*Ibid.*) It was argued that the letter was not testamentary in character because only a small number of its 700-plus words were claimed to constitute a will, the decedent did not mention the word "will" and she did not indicate an intention of disinheriting her two sons. (*Id.* at p. 330.)

Our Supreme Court rejected these arguments and concluded the letter constituted a will: "That [the decedent] did not refer to her property nor indicate any intention to dispose of it in a manner which would result in disinheriting her two boys except in the . . . paragraph above quoted presents no good or legal reason why this paragraph of her letter should not be given effect and construed according to its clear intent. If in one part of her letter she has expressed an intent to make a testamentary disposition of her property, it is a matter of little or no consequence that she did not in other portions of her letter refer to such intent. This is especially true when there is nothing in her whole letter which in the slightest degree conflicts with or casts doubt upon her intention as expressed in the above-mentioned paragraph." (*Button, supra,* 209 Cal. at p. 331.) Furthermore, "[t]he fact that the words, which the proponent claims to be a testamentary disposition of her property, were contained in a letter and were not set forth in a formally prepared will does not detract from their testamentary character. The books

16

are full of cases holding that letters under proper circumstances may be testamentary in character and accordingly they have been proved and judicially determined to be testamentary dispositions of the property of the testator." (*Id*. at p. 332.)[3]

The circumstances in the present case are also similar to those discussed in *Estate of Stephenson* (1965) 235 Cal.App.2d 326. There, the decedent had been a soldier in World War II. During the war, he wrote in the flyleaf of a prayer book that he was in combat and believed he could be killed. (*Id*. at p. 327.) He continued, "If necessary please return my Good Book and all possessions to my Aunt . . . ." (*Ibid*.) He survived the war, continued to live with his "aunt," who, although not a blood relative, was "the person closest to him in life," and he died in 1961. (*Id*. at pp. 327-328, 330.) The trial court ruled that the decedent's flyleaf note was a conditional will regarding the prayer book and the possessions he had with him while overseas fighting the war, and that he otherwise died intestate. (*Id*. at pp. 327-328.) The appellate court held that "the wording in the present will created an absolute, and not a conditional, testament." (*Id*. at p. 329.) It found, among other things, that the extrinsic evidence "supports the view that decedent intended [his aunt] to be the beneficiary of his entire estate" as a result of his flyleaf note, including because of his continuous residence with her until his death, the preservation of the document in his bedroom, the absence of any other will or codicil, and his entrusting of his stock certificates, which were his principal assets, with his aunt. (*Id*. at p. 330.)

---

[3] The decedent also did not sign the letter in any formal way, but, rather, wrote in the margin of the last page, " 'Love from "Muddy," ' " a name she was called by her family. The court found this to be sufficient to constitute a signature. (*Button, supra*, 209 Cal. at p. 328.)

And in *Estate of Wolfe* (1968) 260 Cal.App.2d 587, Division Four of this court concluded that a letter written by Ernest Wolfe, a person who was adjudged to be missing under the Probate Code in 1965, showed testamentary intent even though the letter was written almost 40 years before in 1927, just before Wolfe disappeared. (*Id.* at pp. 590-592.) The letter, which Wolfe wrote to his brother, discussed a variety of matters, including Wolfe's dire economic circumstances, and stated that he was off to look for work and was leaving certain real property for his brother to have if he did not return. It also stated, " '[I]f I were you I would keep this letter.' " (*Id.* at pp. 590-591.) The court, after conducting a careful and thorough analysis of the language of the letter, rejected the argument that Wolfe intended only to convey to his brother a current interest in the real property. (*Id.* at pp. 593-596.) It concluded that the absence of evidence that Wolfe anticipated his imminent death when he wrote the letter was not determinative in light of the language of the letter itself and circumstances surrounding its execution. The court's "overriding interpretation of the letter—reached from its full context" was "that Ernest intended to make a testamentary disposition, effective upon his death and not as of the letter's date." (*Id.* at p. 596.)

Finally, the probate court's reasoning cannot withstand close scrutiny. It gave two reasons for its conclusion that, while Quintana had arguably shown by a preponderance of the evidence that the 2006 Renunciation was Wagner's will, she had not shown this by clear and convincing evidence. It concluded that Quintana and Wagner had kept their property separate, which "seems inconsistent with the idea that after his death, [Wagner] wanted [Quintana] to inherit his separate property." The court's reliance on the couple's separate property was misplaced. We do not see any

18

inconsistency between a couple's decision to keep some assets separate and the same couple's decision to leave their estates to each other in the event of death. It is not particularly uncommon for couples, including married couples, to keep separate property and assets that each owned prior to a marriage or domestic partnership or that were given to one of them during the relationship. In any event, the record indicates that Quintana and Wagner did *not* keep their assets separate. Quintana testified that they shared a checking account and each paid half of their joint expenses, including the expense of educating Quintana's daughter and the mortgage on the house. She further testified that the house was purchased in Wagner's name for tax purposes. This, along with her testimony and that of the couple's friends that the two intended to leave their estates to each other, provides additional evidence supporting Wagner's intent.

The court also concluded that Wagner's decision in July 2012 to designate his disabled sister, Brennan, as a beneficiary of half of his work retirement account "unambiguously contradicts all of the testimony that [Wagner] wanted everything to go to [Quintana] upon his death and creates substantial doubt as to [Wagner's] actual intent at the time he signed . . . the original of [the 2006 Renunciation] . . . ." Again, we disagree. Beneficiary designations on retirement accounts are distinct from estate planning documents. (See *Estate of Davis* (1985) 171 Cal.App.3d 854, 856 ["Upon the death of the depositor, an individual retirement account does not become an asset of the decedent's estate subject to the claim of a judgment creditor, but passes to the named beneficiary"].) The retirement account would not have passed through probate or a will along with Wagner's other property; it would have passed separately from the retirement system to the beneficiaries Wagner designated on his retirement account. Wagner decided to designate

19

his sister as co-beneficiary with Quintana on his retirement account almost six years after he prepared the 2006 Reconciliation, which limits the insight it provides into his intent in 2006. Further, he consulted Quintana about the designation at the time he changed it, suggesting he believed Quintana might otherwise expect it would all become hers. In short, Wagner's designation of his sister as a beneficiary of half of his retirement account in 2012 did not contradict his repeatedly and plainly expressed intent, throughout their relationship, and specifically in 2006, that he was leaving his entire estate to Quintana.[4]

Brennan argues that the 2006 Renunciation is not a validly drafted or executed will under Probate Code sections 6110 and 6111 because it is not handwritten (handwritten, or holographic, wills being covered under section 6111) and Wagner's execution of it was not witnessed as called for under section 6110, subdivision (c)(1). However, a signed document does not have to be handwritten or witnessed under section 6110. Subdivision (c)(2) of that section specifically allows such a non-witnessed document to be admitted into probate as a will as long as its proponent establishes the requisite testamentary intent by clear and convincing evidence.

Brennan also argues that the 2006 Renunciation does not constitute a will because it is a renunciation prepared under Pennsylvania law. This is immaterial. As we have discussed, no particular form of a document is required as long as it evidences the requisite testamentary intent. Thus, a suicide letter, a letter to a brother written decades before any adjudication in probate and a note written in the flyleaf of a prayer book were all found to be

_____

[4] The court also stated that Quintana "failed to present substantial evidence that [Wagner] never intended to revoke" the 2006 Renunciation. Quintana was not required to make this showing under section 6110. Nor did the court find that the 2012 Agreement or any other document or act effected such a revocation.

20

wills, even if they discussed other matters and evidenced intentions beyond the disposition of property upon death.  That Wagner prepared the 2006 Renunciation in a form other than a will and with multiple objectives in mind does not change the result given the clarity of the intent he expressed regarding the disposition of his property after his death.

Brennan further argues that certain circumstances raise questions about Wagner's intention that the 2006 Renunciation serve as his will, such as the fact that he mailed the original to Pennsylvania rather than keeping it, that he kept a copy of it in a box of papers involving his mother's estate and not his own and that he traveled to Pennsylvania to execute a second renunciation document, purportedly making clear his intent regarding the first was merely to renounce his right to be the personal representative of his mother's estate.  These facts are of little consequence.  Again, the decedent need not even realize that a document he or she has prepared is a will; it merely needs to evidence a testamentary intent.  (*Button*, *supra*, 209 Cal. at p. 331.)  Furthermore, Wagner *did* file away a copy of the 2006 Renunciation in a box in the home he shared with Quintana, thereby making it accessible to her upon his death.

Next, Brennan characterizes the relevant language of the 2006 Renunciation as merely "some crude language about his property and [Quintana's] property not being responsible for debts of his mother."  For reasons that we have already discussed, we disagree that the language of the 2006 Renunciation was crude or that it was as limited as Brennan argues.

Finally, Brennan relies on *Estate of Golder* (1948) 31 Cal.2d 848 (*Golder*) in support of her arguments.  On December 13, 1941, Golder, a Navy member, sent a letter to his mother in California saying that he would be lucky in that he would see his wife, Alyse, and child, then living in

21

Philadelphia, for Christmas. He commented on " 'unsettled conditions' " and his desire to persuade them to move to California and told his mother he was enclosing " 'for safekeeping' " his bank stock, life insurance and a letter of credit for a new automobile. (*Id*. at p. 849.) Golder wrote and dated the letter in ink, " 'Your loving son, Bill,' " and wrote underneath his signature in ink, " 'P.S. I have a surprise coming for you and hope it works out. This is all I can tell you.' " (*Ibid*.) He then added in pencil to this postscript, " 'My insurance is made out to Alyse so should I get in this war and not come back I want my savings & stocks to go to you. Keep in touch with Alyse.' " (*Ibid*., italics omitted.) Since his mother received the letter a few days after its date of December 13, 1941, it appeared that he wrote this penciled addition and the body of the letter at about the same time. (*Id*. at pp. 849-850.) About a year and a half after he wrote the letter, Golder was killed in action. (*Id*. at p. 850.)

The trial court, after considering extrinsic evidence, concluded the postscript was not a will because it was " 'wholly lacking in testamentary character' " and " 'was not executed in conformity with the law, by reason of the fact that it was undated and was not subscribed or signed.' " (*Golder*, *supra*, 31 Cal.2d at p. 850.) Our Supreme Court affirmed, concluding that the language of the postscript rendered Golder's intent unclear, as it was not clear if the "surprise" he referred to was related to the sentence that followed or that his directive to his mother to " '[k]eep in touch with Alyse' " indicated his desire to leave property to his mother "depended upon future action." (*Id*. at p. 851.) The court also found support for the lower court's decision in the extrinsic evidence, which included that his wife moved to Nevada shortly before Golder's death to establish residence for the purpose of obtaining a divorce; that sometime after the start of the war, Golder purchased a $9,000

22

policy in which his mother was named as beneficiary; and that the letter made no provision for Golder's child or wife at a time when he was on friendly terms with them. (*Id*. at pp. 851-852.) The court concluded, "In view of the informal character of the document, the lack of certainty in the language used when read with the letter as a whole, and the surrounding circumstances shown by the extrinsic evidence, we cannot say, as a matter of law, that the court was in error in concluding that the letter was not operative as a will." (*Id*. at p. 852.)

*Golder* is easily distinguished from the current circumstances on several grounds. First, Wagner's testamentary intent in the 2006 Reconciliation is clear and unqualified by any further directions suggesting the need for future action, i.e., "my property . . . will transfer without question to [Quintana] in the event of my death." Second, the extrinsic evidence here, which we have already discussed, was dramatically different. Wagner and Quintana remained close throughout the years, Wagner gave Quintana access and control over at least some of his financial affairs and he did not take any steps regarding his estate (which, again, was separate from his work retirement account) that suggested any intention other than to leave everything to Quintana. For each of these reasons, *Golder* also is unpersuasive.

## DISPOSITION

The judgment is reversed. Quintana is awarded costs of appeal.

_____
STEWART, J.


We concur.


_____
KLINE, P.J.


_____
MILLER, J.


*Estate of Wagner* (A154747)