Filed 5/25/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Estate of MELANIE P. BERGER, Deceased. | B321347 |
| | (Los Angeles County Super. Ct. No. 20STPB10201) |
| MARIA L. CORONADO,<br><br>        Petitioner and Appellant,<br><br>        v.<br><br>GLEE BERGER,<br><br>        Objector and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jonathan L. Rosenbloom, Judge.  Reversed.

McBride Law Group and Julia C. McBride for Petitioner and Appellant.

Law Office of Rodney Gould, Rodney Gould and Armine Singh for Objector and Respondent.

\*    \*    \*

The Probate Code mandates that a document will be considered a "will" capable of being probated in court only if the document is in writing, signed (or authorized) by the testator, and signed by two people who witnessed the testator sign or acknowledge her signature.  (Prob. Code, § 6110, subds. (a), (b), (c)(1).)[1]  However, the code will overlook a failure to comply with the two-witness requirement if the party seeking to probate the document as a will "establishes by clear and convincing evidence that, at the time the testator signed the [document], the testator intended the [document] to constitute the testator's will."  (§ 6110, subd. (c)(2).)  This appeal presents two questions:  (1) In evaluating the testator's intent, may a probate court consider extrinsic evidence of the circumstances surrounding the document's execution if the intent expressed by the document's terms is unambiguous, and (2) Do the facts of this case compel, as a matter of law, a finding by clear and convincing evidence that the drafter of the document at issue here intended the document

---

[1]    All further statutory references are to the Probate Code unless otherwise indicated.

at issue to make a revocable disposition of property that takes effect upon her death?  We conclude that the answer to both questions is "yes."  We accordingly reverse the probate court's order declining to probate the document as a will.

FACTS AND PROCEDURAL BACKGROUND

I.     **Facts[2]**

A.     *Melanie Berger's relationships*

Melanie Berger (Melanie) started dating Maria Coronado (Maria) in the spring of 2002.[3]  At that time, Maria was in the midst of a divorce and had three daughters who were then 15, 11, and 10 years old.  Melanie had met the daughters a few times prior to August 2002.  In early August 2002, Maria proposed marriage to Melanie with a diamond solitaire ring and the two became engaged.

Melanie had a sister, Glee (sister).  Melanie and her sister had an "off and on" relationship.  They would talk on the phone each month, but Melanie never mentioned Maria to her sister.

B.     *Melanie schedules gender reassignment surgery*

Melanie was assigned male at birth.

---

[2]     These facts are drawn from the facts the parties stipulated are undisputed, from the exhibits admitted at the evidentiary hearing, and from the testimony at that hearing—all construed in the light most favorable to the probate court's ruling and while discounting any uncorroborated portions of the testimony of the sole witness the court found not to be credible.

[3]     We are using first names for Melanie and Maria to avoid confusion that might arise because Melanie shares a last name with her sister and Maria's last name has changed over time.  We mean no disrespect.

After living as a woman and wearing female clothing for a year as her doctor ordered, Melanie arranged to have gender reassignment surgery in late August 2002.  That surgery entailed the surgical alteration of her sex organs.

After proposing to Melanie but before Melanie had her surgery, Maria traveled to Spain with her daughters to visit family.  While Maria was in Spain, Melanie and Maria corresponded through email using a variety of different email accounts.  Specifically, Maria sent Melanie an email on August 13, 2002, which was the day she arrived in Spain; she sent another email to Melanie on August 14, 2002.

### C.    *Melanie writes a letter purporting to be a will*

On August 16, 2002, while Maria was still in Spain, Melanie printed out a letter on stationery from her then-employer, the Social Security Administration (the letter).  The letter starts with the date "8-16-02"; lists Melanie's full name, address, and social security number; and begins with the salutation "To whom it may concern."  The letter then reads as follows:

> "I, Melanie Perry Berger, with sound mind and excellent health, name Maria L. [Coronado], [lists Maria's then-current address], as my sole beneficiary in the event of my death.  She will take ownership of all my personal possessions and property located at [address of Melanie's house in Pasadena].  She will make the sole determinations as to what she will keep, and what personal belongings that may, or may not, be distributed to any inquiring family members.  She will also receive, and have full discretion of:
>
> 1.    My [Pasadena] home located at [listing address].

2. My retirement Thrift Savings.

3. My 1984 Mercedes Benz 300 CD, license [listing number].

4. My Washington Mutual checking account [listing number].

5. Any and all wages paid to my account, post mortem.

It should be noted that I would prefer to have some of the above Thrift assets set aside for the education of [Maria's] three daughters, [naming each]. This is, however, only a suggestion, and Maria . . . shall have the final decision on these matters."

The letter closes with "Sign[ed] and dated 8-16-02 in Pasadena, California," and beneath it, Melanie's signature. (A scanned copy of the letter, with private information redacted, is attached as appendix A, *post*, page 24.)

No one witnessed Melanie sign the letter.

On the very same day as the letter is dated, Melanie sent Maria an email informing her that Melanie "decided" to "leave the house, all the belongings, [her] record collection and [her] car" to Maria and also would "leave [her] retirement savings in [Maria's] name to be used for the three girls['] college education in the event of [her] death." Melanie explained that she would "leave these documents on [Maria's] desk" "chair" "before [Melanie] leaves" for her gender reassignment surgery.

Over the next several days, Melanie sent several more emails to Maria. On August 18, 2002, she sent an email referring to Maria as her "dearest," "sweetest" "love." On August 19, 2002, Melanie sent a few emails to Maria expressing frustration that Maria had not responded to the "number of emails" that Melanie had sent in the last few days. She also reiterated that "the

documents regarding [her] will to [Maria] will be on [Maria's] desk chair at [Maria's] apartment, and the originals will be in [Melanie's] in[-]box on [her] desk at home." Maria admitted that she had difficulty responding quickly to Melanie's emails.

When Maria returned home from Spain, she found a copy of the letter on her desk chair.

Although Melanie and Maria continued dating for another six months after Melanie's surgery and Maria's return from Spain, the two did not discuss the letter at any point thereafter. Neither Melanie nor Maria mentioned the letter to Maria's daughters.

Melanie did not file the paperwork to designate Maria as the beneficiary on her retirement account.

### D. *Melanie and Maria break up*

Melanie and Maria ended their romantic relationship in the spring of 2003, and ceased all contact with one another.

Melanie became somewhat of a recluse and "hardly ever left the house."

In 2020, Melanie became increasingly religious and told neighbors that she wanted to leave her assets "to the church." There is no evidence Melanie ever memorialized her new intention.

### E. *Melanie dies*

Melanie passed away on November 30, 2020.

As the pastor of Melanie's church was going through Melanie's personal effects in her home, he found the letter at the bottom of one of the drawers of Melanie's desk. The pastor gave a copy to Melanie's sister and called Maria to inform her of Melanie's death.

By this point in time, Maria had lost the copy of the letter Melanie had left on her desk chair 18 years earlier.

## II.    Procedural Background

### A.    *Maria petitions to probate the letter*

On February 4, 2021, Maria filed a petition seeking to have the letter probated as Melanie's will.  Melanie's sister, who was otherwise Melanie's sole heir at law, opposed the petition.

### B.    *The probate court denies the petition after a two-day evidentiary hearing*

The probate court held a two-day evidentiary hearing in September 2021.  Maria, Melanie's sister and a handwriting expert testified.  The court admitted the letter as well as several of the August 2002 emails between Melanie and Maria.

At the conclusion of the second day, the probate court denied Maria's petition.  Because the letter did not comply with the general requirements for a will under the Probate Code, the court viewed its "threshold" task—before reaching any questions of fraud or undue influence—as "ascertain[ing]" "whether" Maria had proven, by clear and convincing evidence, that Melanie intended the letter to be her will.  The court expressed that it "ha[d] doubts about the letter and its context," explaining that "perhaps" Melanie meant to benefit Maria or "perhaps, she had forgotten" about the letter in the intervening years.  The court noted that Melanie had closed her retirement account in 2012, ten years after signing the letter.  The court also had "questions about [Maria's] credibility," insofar as she was "not an accurate reporter of the facts."  Specifically, the court found it hard to believe that Maria and Melanie did not discuss the letter, that they did not discuss Melanie's finances, that Maria did not tell her daughters about the letter, and that Maria did not go through

7

Melanie's house "look[ing] for the [original of the] will"; in the court's view, this was all "strange" and "somewhat inconsistent with what engaged people do." The court also pointed to Maria's inability to remember by name one of Melanie's neighbors whom Melanie mentioned in one of the 2002 emails.

### C. *At Maria's request, the court reopens the hearing but still denies the petition*

In October 2021, Maria filed a motion to reopen the evidentiary hearing to introduce more email correspondence between Melanie and Maria from August 2002. The trial court granted the motion and, in March 2022, held a further hearing where it permitted Maria to offer additional testimony and thereafter admitted some—but not all—of a bevy of additional emails. The court ultimately re-adopted its earlier ruling, but somewhat cryptically added that the "relationship" between Melanie and Maria was "not entirely without questions."

### D. *Appeal*

Maria filed this timely appeal.

## DISCUSSION

## I. Pertinent Law Regarding Validity of Unwitnessed Wills

In California, "[t]he right to dispose of property by will is entirely statutory." (*Estate of Saueressig* (2006) 38 Cal.4th 1045, 1048; *Estate of Manchester* (1917) 174 Cal. 417, 419-420 ["[t]he power to dispose of one's property by will and the mode by which it may be exercised are matters under legislative control"].)

The Probate Code prescribes that a document is effective as a will only if it is (1) "in writing"; (2) "signed" (a) "[b]y the testator," (b) by someone else, but "[i]n the testator's name," "in the testator's presence," and "by the testator's direction," or (c) by

8

a conservator acting pursuant to a court order under section 2580; and (3) witnessed "by at least two persons" who (a) at the same time "witness[]" the testator sign the document or acknowledge her signature or the document, and (b) sign the document "during the testator's lifetime" while "understand[ing] that the instrument they sign is the testator's will." (§ 6110, subds. (a), (b)(1), (b)(2), (b)(3), (c)(1).) Requiring a testator to adhere to such formalities "serve[s] three . . . functions"—namely, (1) "an evidentiary function by furnishing reliable evidence about the testator's intent" that "prevent[s] fraudulent dispositions of [the] testator['s] properties"; (2) "a protective function by reducing the possibility of interference with the process of execution"; and (3) "a cautionary or ritual function to help ensure that the will reflects a considered decision." (*Estate of Eugene* (2002) 104 Cal.App.4th 907, 910; *Estate of Brenner* (1999) 76 Cal.App.4th 1298, 1301-1302 (*Brenner*).)

But these prescribed procedures are not without exception. Specifically, the code will overlook a testator's noncompliance with the two-witness requirement (1) if the "material provisions" of the document are "in the handwriting of the testator" (in which case it is called a "holographic will") (§ 6111; *Brenner*, *supra*, 76 Cal.App.4th at p. 1301), or (2) if the party seeking to have the probate court recognize the document as a will "establishes by clear and convincing evidence that, at the time the testator signed the [document], the testator intended the [document] to constitute the testator's will" (§ 6110, subd. (c)(2)).[4]  These

_____

[4]     Although this second exception did not become effective until January 1, 2009, and the letter at issue in this case was signed in August 2002, this exception applies here because the validity of that letter as a will is being litigated *now*—that is,

9

relaxed procedures are designed to give effect to a drafter's clear intent to dispose of property through a proffered document, even when that document has "procedural deficiencies or mistakes" that cause it to fall short of fully complying with the Probate Code's procedures. (*Stoker*, *supra*, 193 Cal.App.4th at p. 242; *Brenner*, at p. 1301; see generally *Estate of Williams* (2007) 155 Cal.App.4th 197, 206 (*Williams*) [noting "'the policy of the law . . . toward "a construction favoring validity" . . .'"]; § 21120 ["[p]reference is to be given to an interpretation of an instrument that will prevent intestacy . . . rather than one that will result in an intestacy"].) Indeed, our Legislature specifically enacted the exception that authorizes a probate court to give effect to a defectively drafted will when the drafter's intent to do so is particularly compelling as a means of deeming "harmless" "the commission of drafting errors or improper interpretations of instructions for form wills" in the hope that such a "harmless error rule" would "reduce the number of wills thrown out of court, increase the number that are actually probated, and reduce potential litigation." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2248 (2007-2008 Reg. Sess.) as amended Mar. 24, 2008, p. 4-5, archived at <https://perma.cc/DE5B-796H> (as of May 19, 2023).)

In applying the exception set forth in section 6110, subdivision (c)(2), that focuses on whether there is clear and convincing evidence that the drafter "intended the [document] to constitute the [drafter's] will," the probate court's task is to examine whether the drafter "must have intended, by the particular instrument offered for probate, to make a revocable

---

*after* the effective date of the 2009 amendment. (*Estate of Stoker* (2011) 193 Cal.App.4th 236, 244 (*Stoker*).)

10

disposition of h[er] property to take effect upon h[er] death." (*Estate of Sargavak* (1950) 35 Cal.2d 93, 95 (*Sargavak*); *Estate of Wunderle* (1947) 30 Cal.2d 274, 280-281 (*Wunderle*); *Estate of Geffene* (1969) 1 Cal.App.3d 506, 512 (*Geffene*); accord, *Stoker*, *supra*, 193 Cal.App.4th at p. 244 [applying this standard to section 6110, subdivision (c)(2)].)  In assessing "whether [an] instrument . . . was intended to be testamentary," the probate court is to look to (1) the words in the document itself, and (2) the "circumstances" "surrounding" its creation and execution.  (*Estate of Spitzer* (1925) 196 Cal. 301, 307 (*Spitzer*); *Williams*, *supra*, 155 Cal.App.4th at p. 211; *Geffene*, *supra*, at p. 512.)  When it comes to the words used, "[n]o particular words are necessary to show a testamentary intent" (*Wunderle*, *supra*, at p. 280; *Stoker*, at p. 244), but words referring to the drafter's potential death tend to indicate such an intent (*Estate of Button* (1930) 209 Cal. 325, 331-332).  When it comes to the surrounding circumstances, courts may examine, among other things, (1) whether the document was drafted at a time when death was near (or nearer than usual) or whether other "extreme circumstances" exist, as persons drafting documents at such times are more likely to be acting with testamentary intent (*Geffene*, at p. 514 [testamentary intent more likely when "decedent's contemplation of death is reasonably inferable"]; *Estate of Kane* (1965) 236 Cal.App.2d 51, 53 (*Kane*) [same]; *Estate of Spencer* (1948) 87 Cal.App.2d 591, 595 [testamentary intent more likely when drafter "had reason to believe she might not live through" an "operation"]; *Estate of Wolfe* (1968) 260 Cal.App.2d 587, 595 [testamentary intent more likely when drafter is anticipating death or in other "extreme circumstances"]); and (2) whether the drafter has retained the

11

document, as persons are more likely to retain documents that were meant to have lasting effect (*Kane*, *supra*, at p. 53).

## II. Analysis

In challenging the probate court's denial of her petition to have Melanie's August 2002 letter probated as her will, Maria raises what boil down to two arguments. First, she argues that a probate court's analysis of whether a drafter acted with testamentary intent is limited to the four corners of the document proffered as a will if the language in that document unambiguously evinces such an intent. Second, she argues that the probate court's finding that Melanie did not intend the letter to constitute her will is unsupported by substantial evidence.

### A. *Limiting the probate court to the four corners of the proffered document*

Maria first asserts that the probate court erred in denying her petition to declare Melanie's letter to be a will because, in her view, the four corners of that letter unambiguously establish Melanie's intent to dispose of her property upon her death, such that the court was prohibited from looking to any evidence extrinsic to that document. The premise of this assertion is the proposition that a probate court is limited to the four corners of a proffered document—and thus cannot consider any extrinsic evidence—if the terms of the document unambiguously evince a testamentary intent. Because this is a proposition *of law*, we independently assess whether it is correct. (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 165.)

It is incorrect.

Although courts as a general matter may not resort to extrinsic evidence in interpreting the meaning of a document (including a will) when the document's terms are unambiguous

12

(e.g., *Estate of Dodge* (1971) 6 Cal.3d 311, 318; *Estate of Dye* (2001) 92 Cal.App.4th 966, 976), this principle does not apply here. That is because the probate court's task here is not to assess the meaning of the words in a document, but instead to assess the meaning of the document itself—namely, was that document intended to be a will? (*Sargavak, supra*, 35 Cal.2d at p. 96 ["It bears emphasis that we are here concerned not with the meaning of the instrument, but with the intention with which it was executed"]; *Halldin v. Usher* (1958) 49 Cal.2d 749, 752 [same].) In this particular context, an unbroken line of precedent squarely establishes that extrinsic evidence is *always* admissible on the question of the drafter's intent. (*Estate of Torregano* (1960) 54 Cal.2d 234, 246 ["Extrinsic evidence is always admissible for the purpose of proving the circumstances under which a will was executed"]; *Sargavak*, at p. 96 ["an instrument that clearly appears testamentary may nevertheless be shown by extrinsic evidence to have been executed" for other, nontestamentary purposes]; *Estate of MacLeod* (1988) 206 Cal.App.3d 1235, 1241 ["Regardless of the language of the instrument, extrinsic evidence may be introduced to show it was not intended by the testator to be effective as a will"].)

There are three reasons for this rule.

First, and most immediately, this is the rule our Legislature has explicitly adopted. Section 6111.5 provides: "Extrinsic evidence is admissible [(1)] to determine whether a document constitutes a will pursuant to section 6110 or 6111, *or* [(2)] to determine the meaning of a will or a portion of a will *if the meaning is unclear*." (§ 6111.5, italics added.) By its plain text, this statute sets forth two rules regarding the admissibility of extrinsic evidence—one applicable when the question is "whether

13

[the] document constitutes a will" and a second applicable when the question is the "meaning of [the] will."  Through the italicized language, the statute precludes the consideration of extrinsic evidence unless the "meaning is unclear" *only* for the second rule.  Maria would have us import the same unclear-meaning requirement to the first rule.  This is not what the statute says, and we are not at liberty to rewrite the statute.  (*Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 392 (*Jarman*) [noting that "courts 'may not rewrite a statute . . .'"].)

Second, the necessity of resorting to extrinsic evidence is part and parcel of the inquiry into the drafter's intent—which, as noted above, looks not only to the words of the document itself, but also to the "surrounding circumstances."  (*Spitzer*, *supra*, 196 Cal. at p. 307.)  The surrounding circumstances are critical because a document that contains testamentary language might nevertheless not be intended to be a testamentary disposition if, as our Supreme Court has noted, the drafter executed the document "in jest"; if the drafter "misapprehend[ded]" the nature of the document; or if the drafter executed the document with some intent other than to dispose of their property upon death, such as to threaten a third party or induce that third party to take a certain action (or refrain from doing so).  (*Sargavak*, *supra*, 35 Cal.2d at p. 96.)  Proof of these "surrounding circumstances" necessarily lies outside the four corners of the document and hence must necessarily come from extrinsic evidence.

Third, Maria's proffered rule precluding probate courts from examining extrinsic evidence when determining whether a document is a will would effectively write the statutory, two-witness requirement out of the Probate Code because it would

14

deem a signed document to be a will as long as, on its face, the document says it is a "will"—even if it is unwitnessed and even if the surrounding circumstances show a lack of testamentary intent (because those circumstances would, under Maria's proffered rule, be inadmissible in this situation). By making it unnecessary to show *either* attestation by two witnesses *or* the statutory substitute of proof of testamentary intent, Maria's rule would effectively eliminate the code's two-witness requirement. Again, we are not at liberty to rewrite statutes. (*Jarman*, *supra*, 10 Cal.5th at p. 392.)

Maria resists this conclusion by citing to language in *Stoker*, *supra*, 193 Cal.App.4th 236, which concluded that language in the proffered document showed an "evident" "testamentary intent," and went on to note that "even if the document is ambiguous, the trial court properly admitted extrinsic evidence." (*Id.* at p. 244.) From this, Maria infers that *Stoker* adopted a rule that extrinsic evidence is admissible only if the document's language is ambiguous. We reject this inference, and instead read this verbiage in *Stoker* as taking a belt-and-suspenders approach and ruling in the alternative, rather than clandestinely rejecting an unbroken line of binding Supreme Court precedent and a statutory mandate directly on point.

**B.** *Substantial evidence to support the probate court's ruling*

Maria next asserts that the probate court's order denying her petition is unsupported by the evidence. Because the order rests on its consideration of extrinsic evidence, our review is for substantial evidence. (*Williams*, *supra*, 155 Cal.App.4th at pp. 205-206, 211.) By definition, substantial evidence review is deferential to the ruling below—and makes it difficult to show

15

reversible error—due to the prism through which it mandates we review the evidence:  We must resolve all conflicts in the evidence in favor of the ruling below (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912-913), must draw all reasonable inferences from that evidence in favor of the ruling below (*People v. Navarro* (2021) 12 Cal.5th 285, 339), and may not reweigh the evidence or any credibility findings (*In re Caden C.* (2021) 11 Cal.5th 614, 640).  Showing error under substantial evidence review is particularly onerous where, as here, the ruling on appeal was resolved *against* the party who bore the burden of proof in the court below:  In that instance, we may reverse only if—using the prism described above—the evidence compels a finding in that party's favor as a matter of law.  (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769; *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.) And the bar for obtaining reversal is even higher where, as here, the party's burden below required her to produce "clear and convincing" proof—that is, proof that establishes the fact at issue to a "high probability" or "so clear[ly] as to leave no substantial doubt." (*Estate of Ben-Ali* (2013) 216 Cal.App.4th 1026, 1037 (*Ben-Ali*); *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006-1007 (*O.B.*).)  Applying these principles, we can reverse only if we conclude that the evidence below as a matter of law compels a finding by clear and convincing evidence that Melanie intended her August 16, 2002, letter to be testamentary.  This is a very heavy burden, but it is not insurmountable.  (*O.B.*, *supra*, at pp. 1006-1007.)

This is one of those rare cases where this very heavy burden has been met.

16

Taken together, the words in the letter itself and the circumstances surrounding its creation and execution compel the finding, as a matter of law, that Melanie intended her letter to have testamentary effect. The substance of the letter names Maria as Melanie's "sole beneficiary in the event of [her] death" as well as the person who has "full discretion" to dispose of "all [of her] personal possessions and property"; lists four of Melanie's most significant assets (namely, her house, her retirement account, her car, and her checking account); and even contemplates that "inquiring family members" might seek some of her belongings, but leaves it to Maria to decide which "personal belongings" to give them. The format of the letter also evinces a level of formality consistent with a document meant to have enduring effect: Melanie drafted the letter on her work stationery;[5] recited her full name, address, and social security number; addressed it "[t]o whom it may concern"; started the letter with a recitation of her "sound mind and excellent health"; and concluded the letter with a recitation of the date and location of signing as well as her signature. The surrounding circumstances further—and, in our view, conclusively—confirm Melanie's intent "to make a revocable disposition of [her] property to take effect upon [her] death." (*Sargavak*, *supra*, 35 Cal.2d at p. 95.) Melanie told Maria—the "sole beneficiary" and effective executor of the will—that Melanie was executing a "will"

---

[5] Melanie's sister asserts that there was no evidence that the stationery came from the same Social Security Administration office where Melanie was working at the time, but it is undisputed that Melanie was working at the Administration at the time; any failure by Melanie to use the most up-to-date location has no bearing on her testamentary intent.

17

and Melanie did so in an email sent on the very same day she created and executed the letter. What is more, Melanie on that date was days away from having major surgery, and hence wrote the letter at a moment in time when she was more acutely facing her own mortality. Melanie also treated the letter like a will insofar as she gave Maria (again, the sole beneficiary and executor of the will) a copy of the letter and kept the original for herself in a place where it was likely to be found—and was, indeed, found—decades later.

None of the reasons cited by the probate court or proffered by Melanie's sister negate this conclusion.

The probate court rejected Maria's claim based on what can be grouped into three reasons.

First, the court generally noted its "doubts about the letter and its context" as well as its concerns that Melanie and Maria acted "inconsistent[ly] with what engaged people do." More specifically, the court pointed to the facts that (1) neither Melanie nor Maria subsequently told other people (such as Maria's daughters or Melanie's sister) about the letter, and (2) Melanie and Maria did not thereafter discuss the letter between themselves. As to the first point, testators typically share a will with the persons most affected by that will, such as the will's beneficiaries and its executor. Here, Maria is both the sole beneficiary and the effective executor named by Melanie, and Melanie not only told her about the "will" on the day it was created, but also gave her a copy and told her where to find the original. The fact that neither Melanie nor Maria stood on a proverbial mountaintop and shouted news of the will to others is of no consequence, particularly when the only other persons identified as potential recipients of the will were Melanie's

distant sister and Maria's teenage and pre-teen daughters. As to the second point, Melanie and Maria's failure to discuss at a later point in time a will that Melanie had already executed and had already delivered has no bearing on Melanie's intent at the time of execution; a contract does not become less of a contract because the parties do not talk about it later. What is more, whether Melanie and Maria were, in the probate court's eyes, a conventional or unconventional engaged couple more generally is wholly irrelevant.

Second, the court questioned Maria's "credibility" as "an accurate reporter of the facts." We recognize that we cannot second guess the probate court's credibility findings, but the significance of the court's credibility finding to the court's ruling is difficult to assess. We cannot accept that the court rejected *all* of Maria's testimony as not credible because the court seemed to accept as true *some* of Maria's testimony and because much of Maria's testimony was otherwise corroborated by emails or facts that the parties stipulated were undisputed. What is more, the specific testimony that the court identified would, if rejected as not credible, tend to *support* a finding of Melanie's testamentary intent under the logic the court was applying. For instance, the court may have not believed—as opposed to rejecting as "inconsistent with what engaged people do"— the facts testified to by Maria that she and Melanie did not share news of the will with others or further discuss the will or Melanie's finances among themselves; but if Maria was not truthful about those facts, and Maria and Melanie *had* told others of the will and further discussed it among themselves, then that would tend— under the probate court's stated reasoning—to counsel in favor of a finding that Melanie had testamentary intent. What is more,

19

*Maria's* failure to go hunting for the original document in Melanie's house or to remember the name of a neighbor that Melanie mentioned in passing in a 2002 email has no bearing on *Melanie's* intent when drafting the letter.

Third, the court cited the "questions" it had about Melanie and Maria's "relationship" as well as the possibility that Melanie may have "forgotten" about the will. These concerns are irrelevant to the pertinent question of intent under section 6110, subdivision (c)(2). As for the nature of Melanie's and Maria's relationship, it is undisputed that at the time the letter was drafted, Melanie was in "love" with Maria and that she and Maria were engaged. Whether it was *wise* for Melanie to have drafted a will leaving all of her possessions to someone she started dating six months earlier is irrelevant to whether she intended the document she drafted to be a will; critically, it is not for the courts to act in a *parens patriae* role over competent adults by second-guessing the wisdom of their personal decisions. As for whether Melanie forgot about the will after she and Maria parted ways, a person's failure to revisit a will in light of changed circumstances has nothing to do with her intent *at the time she drafted the will.* (*Ben-Ali*, *supra*, 216 Cal.App.4th at p. 1037 [looking to what the testator intended "at the time [s]he signed it"]; *Estate of Anderson* (1997) 56 Cal.App.4th 235, 247 [focusing on "the testator's intention . . . at the time [s]he executed the will"]; accord, *Estate of Boysen* (Or.App. 2019) 441 P.3d 633, 635-636 [looking to drafter's intent that "the specific writing at issue . . . be . . . her will at the time of its creation" and not "at the time of [her] death"].)

Melanie's sister offers five additional reasons why, in her view, the evidence does not compel a finding in Maria's favor. None is persuasive.

First, the sister urges that the cases have upheld a document as a will under section 6110, subdivision (c)(2), only when there is at least one witness to the will's execution (e.g., *Stoker*, *supra*, 193 Cal.App.4th 236), and that we should formally adopt this as a prerequisite. This would require us to rewrite the statute to add a new prerequisite; as noted above, this is beyond our purview. (*Jarman*, *supra*, 10 Cal.5th at p. 392.)

Second, the sister argues that the record is silent as to how the letter was prepared and who prepared it. While Melanie—the sole witness to the letter's creation—was not able to testify that, on August 16, 2002, she drafted the letter on her computer herself and then printed it out on her work stationery, that is the only reasonable inference from the letter itself as well as from Melanie's same-day email to Maria reporting what she had just done. Plus, the handwriting expert's conclusion that the signature on the will is Melanie's signature is unchallenged. The sister's suggestion that someone else authored the letter or that there was something suspicious about how it came to be on the stationery or in Melanie's desk 18 years later is based on nothing but speculation. Indeed, our Legislature in enacting section 6110, subdivision (c)(2), specifically sought to give effect to "self-drafted will[s]" that are "type[d] . . . on the computer, print[ed] . . . , and sign[ed]." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2248 (2007-2008 Reg. Sess.) as amended Mar. 24, 2008, p. 2, archived at <https://perma.cc/DE5B-796H> (as of May 19, 2023).) The sister's argument questioning the validity of Melanie's will because it was typed, printed, and signed is thus wholly at odds

21

with the legislative intent animating section 6110, subdivision (c)(2).

Third, the sister points out that Melanie's retirement account was closed in 2012, but a document that was intended to be a will at one point in time does not somehow retroactively lose its status as a will merely because some of the property devised in the will subsequently passes out of the drafter's putative estate.

Fourth, the sister contends that Melanie drafted the letter—not to dispose of her property—but instead to get Maria's attention while she was abroad because Maria was not being quick enough in responding to Melanie's emails. This contention is unsupported by the record, as the only emails by Melanie expressing some frustration with Maria's response time were all drafted *after* the August 16, 2002, letter; there are no emails and no other evidence evincing Melanie's frustration prior to Melanie's creation of her will.

Lastly, the sister at oral argument asserted that there was no evidence presented regarding Melanie's competency to execute a will or whether she was under any undue influence at the time she wrote the letter. These assertions are irrelevant to the question of whether the document *was intended* as a will, which is the only question before us. Whether it *is enforceable* as a will is a distinct and separate issue not presently before us.

## DISPOSITION

The order is reversed.  Maria is entitled to her costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>.**


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ

# APPENDIX A



**SOCIAL SECURITY**

Torrance District Office
22600 Crenshaw Blvd.
Torrance, CA 90505

8-16-02

Melanie P. Berger
1749 N. Marengo Ave.
Pasadena, CA 91103

To whom it may concern:

I, Melanie Perry Berger, with sound mind and excellent health, name Maria L. Quinn, address 10655 Sherman Grove Ave., Apt. 14, Sunland, CA 91040, as my sole beneficiary in the event of my death. She will take ownership of all my personal possessions and property located at 1749 N. Marengo Ave., Pasadena CA 91103. She will make the sole determinations as to what she will keep, and what personal belongings that may, or may not, be distributed to any inquiring family members. She will also receive, and have full discretion of:

1. My home located at 1749 N. Marengo Ave., Pasadena, CA 91103.
2. My retirement Thrift Savings.
3. My 1984 Mercedes Benz 300 CD, license
4. My Washington Mutual checking account #
5. Any and all wages paid to my account, post mortem.

It should be noted that I would prefer to have some of the above Thrift assets set aside for the education of Ms. Quinn's three daughters, Eileen Quinn, Kathleen Quinn and Carolyn Quinn. This is, however, only a suggestion, and Maria L. Quinn shall have the final decision on these matters.

Sign and dated 8-16-02 in Pasadena, California

*Melanie P. Berger*